**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  | x |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| -vs- | : | |
| | : | |
| GREGORY ABBOTT and | : | Index No. 19-cr-10117 |
| MARCIA ABBOTT, | : | |
| | : | Leave to filed granted on |
| Defendants. | : | October 1, 2019 |
| | : | |
| | : | |
| | x | |

**<u>JOINT SENTENCING MEMORANDUM ON BEHALF</u>**
**<u>OF GREGORY AND MARCIA ABBOTT</u>**

## PRELIMINARY STATEMENT

This joint sentencing memorandum is respectfully submitted on behalf of Gregory and Marcia Abbott, a married couple before the Court for sentencing. Greg and Marcia are good people, who made a terrible mistake at a time of extreme stress in their marriage and family life. For the reasons set forth below, we respectfully submit that a sentence of incarceration is not necessary and would be wholly unwarranted in this case. We respectfully submit that the Court should impose a sentence of probation for both Greg and Marcia, to include substantial community service.

The Abbotts were introduced to Rick Singer in early 2018 during one of the worst chapters of their lives. Their daughter, ████ was struggling with late-diagnosed chronic Lyme disease, which had forced her out of a high school where she was thriving. Their son, Malcolm, was battling drug addiction, ███████████████████████. Their 31 year marriage was strained to the breaking point. Marcia had recently moved out of the couple's New York City home with ████ for Colorado, while Greg remained in New York with Malcolm. (GA PSR ¶ 106; MA PSR ¶ 108). Both parents, alone and divided, were consumed by the needs of their children, Greg working tirelessly with Malcolm in his battle with addiction while Marcia saw to ████ medical care and home schooling in Colorado. They were neck deep in water when Rick Singer threw them what they thought was a life preserver. It was a harpoon.

Greg and Marcia did not set out to help their daughter cheat on a college entrance examination when they met Rick Singer. ████ was being home schooled. She had no real college counselor and needed one. Rick Singer claimed to have founded the online school Laurel Springs, that was providing the coursework for ████ home-schooling. The Abbotts trusted him at first, and believed his services were legitimate. ████ suffering from neurological defects and fatigue

common in chronic Lyme, had been recommended for extra time on the entrance exams on the merits before the Greg and Marcia had ever heard of Singer. When Rick Singer told the Abbotts he could arrange for testing at a location that specialized in working with sick children it was not the red flag it would have been for parents with healthy children.

But the Abbotts make no excuses for what happened next. As their relationship with Singer deepened it started to become clear that Singer was going to essentially guarantee ███ scored at a certain level, something he could only do through cheating, the Abbotts knew. Greg and Marcia each knew then that they should walk away. Neither did. Their marriage on the brink of collapse and fear of failing ███ mounting they made a terrible decision. To their great regret, they permitted Rick to manipulate their daughter's results, without her knowledge, on college entrance exams. While they rationalized it to themselves at the time, they knew in their hearts that this was deeply wrong.

The Abbotts are law-abiding people and, even now, find it hard to believe they went along with Singer's plan. It was truly an aberration. As more than 40 letters testify, the Abbotts are fundamentally good people who have assisted others in times of need, worked actively with numerous charities, and held themselves to a high ethical standard in their own lives. They have simply never done anything remotely like this before. When their sons Ian and Malcolm applied to college, the Abbotts took a hands off approach, understanding that their children were all different, each with a unique path. The Abbotts accepted and supported their unique paths: Ian's entrepreneurial efforts and Malcolm's music career. It is of great significance that when they were working with Singer, Greg and Marcia's marriage was rapidly deteriorating, under the stress of their son's increasingly alarming addiction, ███ declining health, and other issues.

Greg and Marcia are wealthy people. But this was not a crime borne of privilege. It was borne of sickness and addiction, great equalizers that strike the rich and poor alike. Their moral failing came not from a desire to boost their egos or status by foisting prestigious schools upon their offspring but from judgment-clouding desperation to give their sick daughter some modicum of normalcy. Simply put, not all parents who engaged in criminal conduct with Rick Singer got to that dark place in the same way, or for the same reasons. The appropriate punishment must be individualized to account for the differences. The case of the Abbotts arose from good people making an aberrational, terrible decision in uniquely trying circumstances. Based on the factors set forth in 18 U.S.C. § 3553(a), we respectfully submit that the Court should sentence Greg and Marcia to a term of probation, to include substantial community service. Such a sentence would be just and proportionate, and would permit the Abbotts to continue to help their family heal.

## I.   FACTUAL BACKGROUND

It is impossible to understand the Abbotts' conduct in this case without considering the many challenges they faced in the period leading up to their involvement with Rick Singer. The various letters and exhibits submitted with this memorandum make clear that Greg and Marcia Abbott are dedicated parents, loyal friends, honest principled people, and generous members of the community. By the Spring of 2018, however, Greg and Marcia were facing a whirlwind of family, financial, and health challenges that had strained their lives in the extreme.

### A.   Greg and Marcia Abbott's Personal Background & Character

#### 1.   Greg Abbott

Greg was raised in Ithaca, New York; his parents moved to New York City while he was attending Princeton, majoring in History. Out of a sense of filial duty, to help his ailing father, Greg initially went into the family apparel business and, at the age of 29, took it over and made it a success.  (H. Koller Letter, Ex. B, Tab 21). Friends describe a man who is a "genuinely

emotionally honest and caring person." (J. Cobler Letter, Ex. B, Tab 8). "The Greg I know is exceptionally selfless. His record of charitable giving to those beset by misfortune and disfavored by nature is well-documented[.]" (A. Napolitano Letter, Ex. B, Tab 28).

Greg has often combined his business instinct with his generosity. He founded International Dispensing Corporation (IDC) in 2000, a packaging company that "has developed patented technology that can safely dispense aseptic milk, juice, and other nutritious liquids in bulk, keeping the package's remaining contents shelf-stable for weeks/months without the need of refrigeration or preservatives." (S. Sundlun Letter, Ex. B, Tab 36). The product assists those in countries without consistent access to refrigeration. Greg worked "passionately" on the company's mission, motivated by the desire to help others. (*Id.*). "Greg has always chosen to do positive work with his assets, helping others in need and striving most recently with his humanitarian efforts to provide sustainable liquid consumables" to those in need. (W. Brock Letter, Ex. B, Tab 4).

At times Greg has been too trusting, investing much of the Abbott's finances with Reed Slatkin who ran the largest Ponzi scheme in U.S. history prior to the Madoff scheme. (M. O'Donnell Letter, Ex. B, Tab 29). Even then, Greg showed his resilient and optimistic side, serving as the co-chairman of the Creditor's Committee which included, "hundreds and hundreds of hours working with [the attorneys] to help the entire group of victims." (R. Wynne Letter, Ex. B, Tab 43). Despite his own shock and emotional devastation, Greg led a fundraising effort to help one victim of the scheme who was quadriplegic and had entrusted Slatkin to "manage her settlement funds [received as a result of the accident that injured her] so she could obtain a secure investment return." (*Id.*).

        2.     Marcia Abbott

Born in the New York suburbs, Marcia attended and graduated from Duke University with a degree in English before pursuing a career as a magazine editor and writer. Marcia's family

recalls a compassionate young woman. One of her sisters describes Marcia as "a kind and generous human being and a great sister and friend. Even as a child, she spoke the truth and upheld the morals with which we were raised." (S. Laing Letter, Ex. B, Tab 23). Marcia's sister Gay describes a young woman who "was unaffected by the crowd or trends" and who "was always off reading a book." (G. Corning Letter, Ex. B, Tab 10). Marcia's friends describe her as "a woman of integrity and heart." (J. Elmlinger Letter, Ex. B, Tab 14).

Marcia's friends also describe a woman who "has given her time and resources to countless schools and young people with difficult health or socio-economic circumstances is a reflection of who she is. She is a true empath, and has always been propelled by a need to give back." (G. Corning Letter, Ex. B, Tab 10). She is someone who donates her money and volunteers her time, working with "English in Action, tutoring people who have recently moved from other countries but cannot yet read or write English." (T. Fulton Letter, Ex. B, Tab 16). Marcia is a woman who, "touches things with care and circumspection, just as she treats humans and creatures with care and respect." (A. Casey Letter, Ex. B, Tab 5). She, "is also refreshingly innocent in many ways, with an earnestness that is rare." (J. Shield-Taylor Letter, Ex. B, Tab 35). Marcia's friend recounts what Marcia said to him when she asked him to be godfather for ███████ (T. Fulton Letter, Ex. B, Tab 16). "You are ethical, a seeker, and unmoved by money or status, she said. Although I was flattered, I knew that she was actually stating her own values." (*Id.*).

B.    Greg & Marcia's Marriage and Family Life

Greg and Marcia met in the mid-1980s at a party on Long Island, New York.  (GA PSR ¶ 98; MA PSR ¶100). After dating for a year and a half, they eloped while on a trip and were married on January 4, 1987. (GA PSR ¶ 98; MA PSR ¶100). Then, to the great pleasure of their parents, they celebrated their marriage at a church in New York City, in May of the same year. (GA PSR ¶ 98; MA PSR ¶100). They moved to Colorado and had three children: Ian, Malcolm and ███████

(GA PSR ¶¶ 93, 101-04; MA PSR ¶¶ 93, 103-07). The Abbotts are "solid members of the communities to which they belong and act positively and quietly to make a better world." (D. Sevastopoulo Letter, Ex. B, Tab 34). This dedication for their communities, whether they be of friends, family, or strangers, shows throughout their acts of kindness and compassion.

Both through their joint charity work and individual contributions, Greg and Marcia have been steadfastly dedicated to their communities. Together, Greg and Marcia helped launch Andrea Jaeger's Silver Lining Ranch, which worked with children "with cancer, cystic fibrosis, sickle cell anemia." (R. Gould Letter, Ex. B, Tab 17). They opened their home to these children and provided many of them financial scholarships. (*Id*.; S. Sundlun Letter, Ex. B, Tab 36). "These children found a welcome home at the Abbotts." (S. Sundlun Letter, Ex. B, Tab 36). When Andrea Jaeger finally build her camp near downtown Aspen, the dining room was called the Greg and Marcia Abbott Dining Room.

Their compassion is not limited just to strangers; countless friends describe their committed support in times good and bad. Together, over 40 individuals wrote letter in support of the Abbotts. These friends and family describe Marcia and Greg as sources of unconditional love and support. One close friend details how the Abbotts paid for the costs for ████████████████████ ██████ for a close friend who had worked for the United Nations. (R. Gould Letter, Ex. B, Tab 17). This was done "out of respect for our friend's courage and good works." (*Id*.). ████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████

As soon as he found out that his best friend, George Kriste, had unexpectedly passed away, "Greg immediately stepped in to offer support and reassurance [to his family]. He worked with

[the] estate attorney to oversee and resolve some outstanding questions involving stock options, quietly removing one source of stress at a very difficult time . . .  He also flew to Carmel to deliver an eloquent, heartfelt eulogy[.]" (R. Kriste Letter, Ex. B, Tab 22). Similarly, Marcia's friend of more than 40 years describe a woman who "never hesitated to put [the friend's] needs over her own.  She gave her time unconditionally and was always there for me." (J. Elmlinger Letter, Ex. B, Tab 14). Marcia is someone who "opened her doors, emotionally as well as physically" to a friend in need. (U. Parker Letter, Ex. B, Tab 31).  A friend recalled Marcia's support in his time of need: "Whenever anyone needs help she is there for them, including much later for myself, when things hit an unexpectedly down turn in my life." (A. Christian Letter, Ex. B, Tab 6).

Above all commitments to their community and friends, Greg and Marcia remain steadfastly dedicated to their family. Greg and Marcia moved their family to New York City in 2002 to raise the Abbott children closer to their extended families and to allow Greg to care for his ailing father. (Amb. H. von Damm Letter, Ex. B, Tab 39). Greg's friends describe this close relationship as having, "never seen a closer or healthier father-son relationship than the one Greg had with his father." (M. O'Donnell Letter, Ex. B, Tab 29)."

Marcia "was very close with her parents." (J. Elmlinger Letter, Ex. B, Tab 14). Showing a commitment to and an unwavering love for her mother during a difficult time, Marcia tended to her mother, while she was dying from colon cancer. Marcia's sister recalls Marcia caring to their mother with patient respect: "Marcia was up in Westchester with her almost 7 days a week, tending to her every need. Colon cancer is not easy, but Marcia handled the frequent accidents and messiness as if nothing had happened, doing everything she could to preserve the dignity of our mother in her last days." (G. Corning, Ex. B, Tab 10).

More than anything else, though, Greg and Marcia are loving, faithful parents, often putting the needs of their three children, Ian, Malcolm, and ███ above their own. Friends have witnessed this commitment, "I have witnessed the love, concern, and patience they have for their children." (L. Clifford Letter, , Ex. B, Tab 7). Friends know that "[a]bove all, Greg is a family man." (B. Thörn Letter, Ex. B, Tab 38). Marcia's friend remembers that Marcia put aside her physical comfort after six hours of surgery "and the news that it was ███ . . . yet her first worry was for her children." (E. Owen-Tomasson Letter, Ex. B, Tab 30).

Greg and Marcia celebrate the uniqueness of each of their children. "Unlike many parents in their world who try to mold their children, Greg and Marcia recognized and nurtured their kids' passions with love, wisdom, and quality attention." (J. Sutin Letter, Ex. B, Tab 37). The Abbotts supported their son, Ian, when he decided to leave Dartmouth before graduation to follow his entrepreneurial dreams. They recognized that their son, Malcolm, would benefit from a less traditional college if college at all, and supported both his decision to attend Bard (which does not require test scores) and to pursue his passion for music. They realized that their children had to find their own paths in the world and simply wanted to provide a healthy and loving environment where their children's dreams would be possible.

C.    Sickness, Addiction and Martial Breakdown Put Greg and Marcia On The Brink

While Greg and Marcia lived happy and fulfilled lives, two challenges – ███ sickness and Malcolm's addiction – begin taking an increasing toll. In early 2017 the family was living together under one roof, with ███ finishing up her sophomore year in high school and singing for the Metropolitan Opera. (GA PSR ¶ 105-106; MA PSR ¶ 106-107). A year later, the family was in a state of collapse. (GA PSR ¶ 100; MA PSR ¶ 102. ███ had been forced out of high school from illness. (MA PSR ¶ 107). Marcia and Greg had separated. (GA PSR ¶ 100; MA PSR

¶ 102). What happened in this dramatic year is essential to understanding how the Abbotts found themselves in the circumstances that are at the heart of the offense.

The Abbotts middle child, Malcolm, had started using drugs █████████████ ██████████████████████████████████████████████████████████████████ ████████████ GA PSR ¶ 103; MA PSR ¶ 105). Like many addicts, his personality changed dramatically as cycles of sobriety and relapse waxed and waned. When he isn't using, Malcolm "has a good heart but becomes a different person while under the influence of drugs." (MA PSR ¶105). When using, Marcia, "dreaded each time the phone rang, expecting to hear tragic news." (M. Abbott letter to the Court). Greg too was "distraught" over Malcolm's issues, once calling a business associate from the hospital saying that he was "trying to save a life." (B. Thörn Letter, Ex. B, Tab 38). But the couple continued to try to assist him in any way possible, coaxing their son to enter into rehab at various times, and trying whatever they could to help him, sparing no expense.

With █████ the Abbotts faced a different set of challenges. Healthy in her early childhood, █████ began suffering from a number of medical problems starting in third grade, including ████████████████████████████████████████████████████████ █████████████████████." (GA PSR ¶ 105; MA PSR ¶ 107). In her early teens, she frequently had ████████████████████████████████████████████████████████ █████████████████████████████████. (M. Abbott Letter, Ex. A). In tenth grade, ██████ was diagnosed as having mono, sleeping for days at a time, with symptoms far worse than would have been expected. (MA PSR ¶107). █████ who had a "remarkable singing voice which gained her a place at the New York Metropolitan Opera" (J. Cobler Letter, Ex. B, Tab 8), was struggling deeply. Maddeningly, no one knew exactly what was

behind her deteriorating health. Finally, in eleventh grade, after seeing rounds of specialists with no answers, she ultimately was diagnosed with Lyme disease. (M. Abbott Letter, Ex. A; MA PSR ¶ 107). When ███████ blood test results came back, the doctor reported ██████████ ████████████████████████████████████████████ (M. Abbott Letter, Ex. A; H. Abbott Lab Results, Ex. C).

Lyme disease is a serious and difficult to treat medical condition, particularly when not detected early. Though Lyme disease may initially manifest as a rash, sometimes with a "bull's-eye" appearance, the rash may go unnoticed, delaying treatment until more aggressive symptoms become apparent. (*See* Center for Disease Control and Prevention, *Signs and Symptoms of Untreated Lyme Disease*, CDC.GOV, https://www.cdc.gov/lyme/signs_symptoms/index.html (last visited Sept. 25, 2019), Ex. D, Tab 1). These more serious, long-lasting symptoms may include headaches, arthritis with severe joint pain and swelling, intermittent pain, inflammation of the brain, and nerve pain. (*Id.*). Neuropsychiatric symptoms feature prominently in Lyme disease; these symptoms include memory loss, fatigue, and hearing loss. (Eric L. Logigian, M.D., Richard F. Kaplan, Ph.D., and Allen C. Steere, M.D, *Chronic Neurologic Manifestations of Lyme Disease*, N. ENGL. J. MED. 1990 (medical study seeking to define the chronic neurological syndromes developed after the onset of Lyme disease) (available at: https://www.nejm.org/doi/full/10.1056/NEJM19901122323 2102), Ex. D, Tab 2).  It is not uncommon that, like ██████ patient's journeys through the symptoms of Lyme are marked with prolonged suffering through the disease's symptoms. (*See e.g.*, Mairead Eastin Moloney, *I took all the right meds for Lyme, so why didn't I get better?*, WASH. POST (April 1, 2016), https://www.washingtonpost.com/national/health-science/it-was-one-little-bite-why-couldnt-i-recover/2016/04/01/27d3f2aa-e554-11e5-bc08-3e03a5b41910_story.html), Ex. D, Tab 3.

In 2017, the twin challenges the Abbotts faced with ███ and Malcolm peaked. ███ condition was rapidly worsening. (M. Abbott Letter, Ex. A). Though they tried to treat ███ with rounds of antibiotics, ███ extreme case of Lyme caused frequent bouts of exhaustion and other symptoms. (*Id.*). She was sick so often that her school made clear that they could no longer effectively teach her; it was clear she would need to be home schooled on a schedule her disease permitted. (*Id.*). ███ describes one horrifying episode when she was so ███ ███ (H. Abbott Letter, Ex. B, Tab 1) Her health advocate Daisy White recalled a ███ ███ ███ (D. White Letter, Ex. B, Tab 40) (emphasis original).

Marcia especially became consumed with ███ illness. ███ vision was declining, she was losing clumps of hair, and Marcia saw her teenage daughter sometimes walking like "an arthritic 90 year old." (M. Abbott Letter, Ex. A). When she was not treating ███ Marcia was learning everything she could about the still poorly understood disease. Marcia spent her time researching treatments and traveling with ███ to seek doctors with treatment options for ███ Together, with Daisy White, health advocate, Marcia and ███ traveled to Europe for treatments. (D. White Letter, Ex. B, Tab 41). Reflecting on these trips with Marcia and ███ Daisy recalls that Marcia "spoke to me about her dream to create Lyme centers within the United states, to try to find a way to bring these sought-after treatments to those who don't have access to the resources that her daughter does." (*Id.*). Marcia "often talked about giving back later while she traveled the road to heal her own daughter." (*Id.*). Daisy White "was impressed to see how knowledgeable Marcia was about her daughter's diagnosis. It's rare to see a non medical [sic]

professional be Lyme-literate." (*Id.*). A friend remembered that, during this time, Marcia was, "greatly saddened and exhausted, covering everything for her daughter physically and academically, and terrified of losing her son to drugs." (M. Luttrell Letter, Ex. B, Tab 24).

Meanwhile, Malcolm was going through some of the worst battles in his addiction,



Over time, these challenges began to impact Greg and Marcia's relationship and they started to face serious marital issues, brought about by the stresses associated with determining the best steps to take with both Malcolm and ▓▓▓▓ and arguments about family finances. (M. Abbott Letter, Ex. A). They disagreed about the best way to manage Malcolm's addictions and how to respond to his troubling, and at times abusive, behavior. (GA PSR ¶ 103; MA PSR ¶ 102). In regards to ▓▓▓▓ they saw their bright and talented daughter waste away from illness. (M. Abbott Letter, Ex. A). As a friend described, Lyme disease "torments both child and family everyday [sic]. It puts a strain on a marriage, a family's finances and in this case Greg and Marcia's own good judgment." (J. Sagansky Letter, Ex. B, Tab 33).

In early 2018, the strains were finally too much. Marcia moved full time to their house in Colorado with ▓▓▓▓ while Greg remained in New York, struggling to aid Malcolm. (GA PSR ¶

100; MA PSR ¶ 102). Greg's relationship with Marcia and ███ remained strained for the months that followed. (GA PSR ¶ 100; MA PSR ¶ 102). They barely spoke, and when they did, their conversations were filled with acrimony. (GA PSR ¶ 100; MA PSR ¶ 102). Marcia, desperately worried about ███ declining health faulted Greg for not being supportive enough. (M. Abbott Letter, Ex. A). Greg, worried about his failing relationship with both his wife and daughter, wanted to demonstrate he did care. It was against this backdrop that Rick Singer found his way into the Abbotts lives.

D.   The Offense

Rick Singer was introduced to the Abbotts in early, 2018 at one of the lowest points in their lives, as a college counselor for ███ (GA PSR ¶ 34-43; MA ¶ PSR 34-43; M. Abbott Letter, Ex. A). The Abbotts had never been ones to hire high-priced admissions counselors or undertake such over the top measures to secure a "top" college placement for their children. Ian Abbott, their eldest son, got into Dartmouth on his merits: excellent grades and test scores. (D. Edmonds Letter, , Ex. B, Tab 13). Malcolm applied to and attended Bard College – which did not require test scores – through an admissions program based largely on essay writing. (*Id.*).

But ███ situation was very different. She was being home-schooled through course-work provided by the Laurel Springs School, an accredited online school. (M. Abbott Letter, Ex. A; G. Abbott Letter, Ex. A). She wasn't part of any school community. (*Id.*). And she was suffering from chronic Lyme, a disease often manifesting in serious neurological symptoms such as fatigue, arthritis, severe headaches, and shooting pain. (*Id.*).

███ is a very bright woman, and when she could focus fully on studying and the practice standardized tests, she would do well. (D. Edmonds Letter, Ex. B, Tab 13). But, unfortunately, her illness caused ███████████████████████████████████. (M. Abbott Letter,

Ex. A; G. Abbott Letter, Ex. A). She had already begun studying for college admissions tests, but her scores vacillated significantly as she struggled through the ups and downs of her disease. (D. Edmonds Letter, Ex. B, Tab 13). Prior to the Abbotts' introduction to Singer, █████ doctor, Dr. Raxlen wrote a letter substantiating █████ request for an additional time accommodation. (Dr. B. D. Raxlen Letter, Ex. C).

Marcia and Greg knew that █████ would need to defer college by a year or more due to her health but █████ wanted to do it and they both believed that keeping her from going through the process would be detrimental to █████ mental wellbeing. (M. Abbott Letter, Ex. A; G. Abbott Letter, Ex. A). As Marcia put it, "My priority was her health and searching for new cures, but my daughter's priority was to force herself back to as close to normal life as she could, and that meant college. I watched with concern as she continued to crack open ACT and SAT test books, popping Motrin for muscle aches and napping, all while keeping up with her courses and writing her college essays. Her efforts were heroic." (M. Abbott Letter, Ex. A). As Greg described, █████ "resolutely worked through her illness day after day, all but forsaking any social life for sake of her goals and because she had neither the time nor energy for play." (G. Abbott Letter, Ex. A). █████ refused to be held back by her illness, in fact her battle with Lyme diseases had inspired her: she wanted to study auto-immunology and how it affects psychology. (M. Abbott Letter, Ex. A). Daisy White saw the family's struggle, "█████ was increasingly worried about how she would be able to access her intellect to achieve all her goals as a young woman. Marcia [] and Greg [] expressed wanting to give her the best chance of healing given the circumstances, and were naturally stressed about how they could do this for their young, talented daughter who had once been a stand-out student and singer." (D. White Letter, Ex. B, Tab 40).

Rick Singer was introduced to the Abbotts as someone who could assist with ███████ college search and who could act as a guidance counselor. (M. Abbott Letter, Ex. A). Initially, Greg and Marcia believed Singer was legitimate. (*Id.*) They took comfort in the fact that he was associated – or at least claimed to be associated – with Laurel Springs, the online school that was providing coursework to ██████ to complete for her high school years from home. (*Id.*) He initially provided ██████ a tutor that he said would help her study for the tests, bolstering his legitimacy in the Abbotts eyes. (*Id.*). Nor was the fact Singer encouraged the Abbotts to have ██████ take her ACTs at a test center that specialized in accommodating sick children a red flag. ██████ *was* sick. And of course, as an online-schooled student, she had no regular high school at which to take the test. Red flags that would have shot up for parents of healthy children in traditional high schools – or for parents of children whom Singer was apparently encouraging to feign various disabilities to get extra time – simply did not shoot up for the Abbotts. Desperate for a lifeline to navigate college for their sick daughter, the Abbotts latched onto Singer as their answer.

Ultimately, though, the Abbotts begin to understand that Singer's plans involved cheating. The Abbotts had always believed, like ██████ tutor, that she would do far better on the tests once provided with the necessary accommodation due to her illness. (*Id.*) ██████ had scored in the 30s on practice tests before when she had time and was feeling well. For that reason they were not, initially, troubled by Singer's claims that ██████ performance would improve by working with him. As the communications continued, though, it started to become clear that Singer was *guaranteeing* that ██████ would perform at a certain level – something he could only do by cheating. (*Id.*)

While the Abbotts never knew the particulars of what Singer was doing to cheat, the PSR makes these facts clear. Singer arranged for ██████ to take the ACTs at the West Hollywood Test

Center, where he had a relationship with the administrator, allowing Singer to plant a proctor into the testing room to "review or correct the students' answers after they completed the exam." (GA PSR ¶ 28(c); MA PSR ¶ 28(c)). ███ took the ACTs at West Hollywood Test Center on April 14, 2018 with one of Singer's associates, Mark Riddell, serving as the exam proctor. (GA PSR ¶ 42; MA PSR ¶42). After she completed the exam, Riddell changed her answers. (*Id.*). ███ reported score was a 35. Singer claimed in a call to Greg Abbott that without this assistance ███ would have scored 23, though the accuracy of Singer's boast is unknown. (GA PSR ¶¶ 45, 49; MA PSR ¶¶ 45, 49). Singer later arranged for ███ to take the SAT Math and Literature Subject Tests at the West Hollywood Test Center. (GA PSR ¶¶ 50, 52; MA PSR ¶¶ 50, 52). ███ took the exams on October 6, 2018. (GA PSR ⁋ 56; MA PSR ⁋ 56). Her corrected scores were 800 and 710 on the SAT Math and Literature Subject Tests respectively. (GA PSR ¶ 63; MA PSR ¶ 63). It is undisputed that ███ was entirely unaware of anything improper occurring.

Both Greg and Marcia have fully accepted responsibility for their conduct, and now look back in disgust at the self-rationalizations they applied at the time. (M. Abbott Letter, Ex. A; G. Abbott Letter, Ex. A). Greg and Marcia believed at the time that the foundation they were donating to in return for Singer's improper assistance really did help underserved children and schools, which made it easier for them to rationalize their willingness to participate.[1] (*Id.*). They also allowed the fact that ███ was genuinely sick and truly needed accommodations as a rationalization. "Greg was very concerned what the effect of this disabling disease would have on ███ preparations for college." (B. Thörn Letter, Ex. B, Tab 38). Lyme disease is a

---

[1] The Government has taken the position that parents who knowingly participated in the improper scheme with Singer must have known his charity was did no good works at all. But this simply doesn't follow. There is nothing inconsistent about Singer *both* charging relatively wealthy parents for improper assistance in the college admissions process and using some of those funds for legitimate charitable purposes. The Abbotts recall Singer discussing in some detail the charitable work he claimed his foundation was doing and it now appears that Singer has made similar statements to other parents on intercepted calls. (Dkt. 462 at 30, detailing how Singer shared specific information about Singer's charity foundation.).

"crippling, auto-immune disease [that] causes high anxiety, lack of stamina and brain fog, putting

[████] at a severe disadvantage in taking timed standardized tests." (J. Cobler Letter, Ex. B, Tab

8). But they both also knew at the time in their hearts that they were doing something wrong.

The Abbotts explain this best in words of their own. As Greg has written:

> While I believed Rick Singer that I was being altruistic and helping disadvantaged kids, by
> having my foundation donate to his IRS-accredited foundation, I also knew that my sick
> daughter would be getting some kind of help that was outside the rules. I didn't know
> exactly how and, frankly, I didn't want to know. . . .   Yes, I was under intense daily
> pressure, yet there are millions of people with pressures who still play by the rules. (G.
> Abbott Letter, Ex. A).

Marcia in turn writes:

> I should have walked away, but by then I saw him as a lifeline, and was afraid of what
> might happened to my daughter if I backed out. Looking back, I am horrified. What should
> have been flashing 'danger' was registering instead as help. . . .   I betrayed my higher
> nature, and became part of a larger damaging system. I take that very seriously, and take
> responsibility for it. (M. Abbott Letter, Ex. A).

The failure of the Abbotts marriage clearly also had a great deal to do with it. Alone with

[████] in Colorado, Marcia felt abandoned. (M. Abbott Letter, Ex. A). Greg, estranged from both

wife and daughter, was anxious to prove he cared. As Marcia explains, when Singer told her that

the required donation to his charity for the ACTs was $50,000 and for the SATs was $75,000,

Marcia thought the ask was far too high but wanted Greg to be the one to reject it. At this time of

a crumbling relationship this would be more proof again in her mind that he didn't care about

[████] enough. The opposite reasoning pushed Greg to accept the deal: if this was a test about his

commitment to [████] he was determined to pass it. Singer, was, at the time, Greg's "only

connection" to [████] (G. Abbott Letter, Ex. A). When Greg questioned the amount of the

donation, Singer threatened to abandon [████] altogether and leave her in the lurch. He also told

Marcia that "no college wants a kid with Lyme disease." Singer was perfectly placed in a marital

fault, exploiting that position to extract from the Abbotts far more than he obtained from any of the other parents charged in the admissions testing scheme.

The Abbotts conduct here goes against their general nature and character. Under the immense pressures facing them, they had a lapse in judgement and agreed to act improperly in a misguided attempt to give hope to a sick daughter. (M. Abbott Letter, Ex. A; G. Abbott Letter, Ex. A). They also recognized their wrongdoing, and when given the opportunity to correct it, did so by pleading guilty within a month of being arrested. (GA PSR ¶ 1-3; MA PSR ¶ 1-3). The Abbotts' actions, while done knowingly, do not comport with their general natures. Instead, they arose in a time of desperation and weakness and a desire to assist their daughter without fully considering the consequences or meaning of their actions.

Daisy White, a health advocate with an intimate knowledge of ███ illness and expertise dealing with chronic Lyme sufferers has seen it before.  She writes:

> After meeting with quite a few parents of sick children, I've observed similar traits.  They are isolated and they frequently find themselves in situations where need supersedes judgment.  They are desperate to make their children well.  They have tried every treatment 10 times over.  Still they are not able to achieve wellness for their sick children.  This puts these parents up against the wall where they often will accept any solution for what ails their family.  So when parents are at the end of their rope, overly exhausted, in their search for healing they can be vulnerable to predator situation[s], both medically and personally. They are willing to investigate grey areas because they've usually run through all the black and white. By saying this, I don't excuse Marcia's gullibility in the circumstances with Rick Singer; but in my position in working with desperate parents; I've often seen that it's incredibly easy to get a hook into families when pain and vulnerability spills out in every direction. (D. White Letter, Ex. B, Tab 41).

As their friends make clear, Greg and Marcia have not tried to excuse their behavior. One friend noted, that in a recent conversation with Greg, "He made it clear that while he had some explanations . . . he was not going to make excuses or shirk responsibility for his actions." (R. Wynne Letter, Ex. B, Tab 43). A friend of Marcia's said that, "Marcia is remorseful to the point of devastation and profoundly contrite for what happened." (T. Fulton Letter, Ex. B, Tab 16).

Another friend also referenced Greg's remorse, there "may be an explanation for his actions, but as Greg admits, it doesn't justify them." (K. Peters Letter, Ex. B, Tab 32). He admits that it was "an error in judgement," but that "his motive was not to game the system but rather solely to help and provide some relief to his sick child." (J. Cobler Letter, Ex. B, Tab 8 (internal quotations omitted)). Marcia's older sister writes that she knows "that Marcia has great remorse for her lack of judgement. What she did not see then, focused on her daughter's illness and her son's addition, she sees only too painfully now. That she is regretful is an understatement." (G. Corning, Ex. B, Tab 10).

## II.   THE   SENTENCING   GUIDELINES   AND   OTHER   STATUTORY CONSIDERATIONS SUPPORT A SENTENCE OF PROBATION

For the reasons set forth below, we respectfully submit that each of the sentencing factors this Court must consider under 18 U.S.C. § 3553(a) weighs in favor of leniency and in support of a sentence of one year probation including a substantial period of supervised release.

### A.   Legal Standard.

Under 18 U.S.C. § 3533(a), a court "shall impose a sentence sufficient, but not greater than necessary" in order to achieve the specific purpose of sentencing. (18 U.S.C. § 3553(a)). To achieve this goal in sentencing, the court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant," along with a series of additional factors set forth in the statute. (*Id.*).

As part of this consideration, the court must consider "the sentencing range" calculated by the Guidelines. (18 U.S.C. § 3553(a)). The Guidelines, however, "are advisory . . . and the [guideline sentencing range] is not controlling on the question of the substantive reasonableness of a particular sentence." (*United States v. Gates*, 709 F.3d 58, 71 (1st Cir. 2013); *see also United States v. Melendez-Torres*, 420 F.3d 45, 50 (1st Cir. 2005) (finding

*United States v. Booker*, 543 U.S. 220 (2005) made the Guidelines advisory)). Instead, the "Guidelines are meant to provide 'a framework or starting point to guide the exercise of the court's discretion,' which 'promotes uniformity and fairness in sentencing.'" (*United States v. Hurley*, 842 F.3d 170, 174 (1st Cir. 2016) (quoting *United States v. Marchena-Silvestre*, 820 F.3d 196, 200 (1st Cir. 2015))).

B.     The Sentencing Guidelines Calculation.

The Probation Department has calculated a Guidelines Range of 0-6 months imprisonment. If adopted by the Court, this guidelines range provides a strong foundation for the sentence of one year of probation sought by the Abbotts.  Indeed, for the defendants in Zone A of the sentencing Guidelines facing, courts are directed pursuant to application § 5C1.1 Note 2 to consider a non-incarceratory sentence for non-violent first time offenders:

> Subsection (b) provides that where the applicable guideline range is in Zone A of the Sentencing Table (i.e., the minimum term of imprisonment specified in the applicable guideline range is zero months), the court is not required to impose a sentence of imprisonment unless a sentence of imprisonment or its equivalent is specifically required by the guideline applicable to the offense.  Where imprisonment is not required, the court, for example, may impose a sentence of probation.  In some cases, a fine appropriately may be imposed as the sole sanction. (U.S. Sentencing Guidelines Manual § 5C1.1 cmt. n. 2 (U.S. Sentencing Comm'n 2018)).

As an initial matter, the Guidelines applicable to Greg and Marcia's offense are set forth in the November 1, 2018 edition. The applicable offense guideline provision is U.S.S.G. § 2B1.1 (fraud). Under § 2B1.1, the applicable base offense level is 7. (U.S.S.G. § 2B1.1(a)(1)).

Pursuant to the Plea Agreement signed on April 8, 2019, the parties agreed to the following: the offense level increased by 8 because the gain or loss from the offense was more than $95,000 and less than $150,000. (U.S.S.G. § 2B1.1(b)(1)(E)). Next, the offense level decreased by 2 because defendants had accepted responsibility. (U.S.S.G. § 3E1.1(a)). With no criminal history points, Greg and Marcia both fell into criminal history Category I. This calculation led to a

Guidelines recommendation of 12-18 months in custody. The Government recommended nine months in custody each for Greg and Marcia separately. (Gov't Sentencing Memorandum, Dkt. 423 at 26).

The Probation Department, however, rejected the premise of the Plea Agreement that the guideline calculation should be determined by the varying amounts that parents paid Singer and should instead be driven by the amount of any loss, which it found to be zero. The PSR calculated the total offense level to be at 5. (MA PSR pg. 34; GA PSR pg. 34). Using the base offense level of 7, the Probation Department found no offense level increase based loss or gain from the offense.[2] Next, the offense level decreased by 2 because Greg and Marcia accepted responsibility for the offense. Ultimately, the total offense level for each defendant was 5, which corresponds to a 0-6 months in custody recommended sentence. The Court accepted this calculation for the Guidelines on Sept. 13, 2019. (Dkt. 443 at 6).

C.    The Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1)).

In addition to the Guidelines, the Court must consider is the "nature and circumstances of the offense" (18 U.S.C. § 3553(a)(1)) in arriving at an appropriate sentence. Here, the circumstances surrounding the offense, and how they intertwine with the ultimate criminal conduct, are highly relevant to gaining a full understanding of the offense.

At bottom, of course, the offense to which Greg and Marcia pled is identical to the offense committed by other parents accused of participating in Singer's admissions testing scheme. Like these other parents, Greg and Marcia arranged with Singer for Singer to provide improper assistance to their child on college entrance exams, aware that what they were doing was wrong.

---

[2] Most significantly, the PSR stated that there were no losses from the offense; there were no identifiable victims, no "evidence of actual financial loss or reasonably foreseeable pecuniary harm to ACT, Inc., ETS, and the College Board." (MA PSR ⁋ 75; GA PSR ⁋ 75). The PSR also stated that as there were no financial losses, "gain [could not] be used as an alternative measure of loss." (MA PSR ⁋ 75; GA PSR ⁋ 75).

The particular circumstances as to how each of the charged defendants came to commit this offense vary significantly, however, and the circumstances surrounding the Abbotts involvement in the scheme are mitigating in several key respects.

First, Greg and Marcia did not seek out Singer in order to obtain an unfair advantage for their daughter or to cheat in anyway. (M. Abbott Letter, Ex. A; G. Abbott Letter, Ex. A). ▌ was being home-schooled in Colorado and lacked the support that comes standard with traditional schools. (M. Abbott Letter, Ex. A; G. Abbott Letter, Ex. A). Singer was referred to the Abbotts as having previously run ▌ online school, the Laurel Springs School. (M. Abbott Letter, Ex. A; G. Abbott Letter, Ex. A). The initial assistance he provided, including a counselor to review ▌ college application, was legitimate. (M. Abbott Letter, Ex. A; G. Abbott Letter, Ex. A). While Greg and Marcia committed the offense and accept full responsibility for it, it is noteworthy that they not seeking out any sort of improper assistance when they first engaged with Singer.

Second, ▌ Abbott was genuinely sick, suffering from cognitive impairment caused by chronic Lyme. (GA PSR ¶ 105; MA PSR ¶ 107; G. Abbott Letter, Ex. A; M. Abbott Letter, Ex. A; D. White Letters, Ex. B, Tabs 40-41). The Abbotts did not work with Singer to create an imaginary or exaggerated disability to provide a healthy and privileged child with even more advantages. ▌ was indisputably suffering ▌ at the time the Abbotts listed Singer's assistance. (M. Abbott Letter, Ex. A). Daisy White, a health advocate familiar with ▌ illness, explains that ▌ suffered from ▌ ▌ (D. White Letter, Ex. B, Tab 40). ▌ "started losing clumps of her hair . . . [and] went through stages where she could not retain or recall information." (J. Shield-Taylor, Ex. B, Tab 35). ▌ recalled even the morning she wrote her letter to the Court, ▌

████████████████████. (H. Abbott Letter, Ex. B, Tab 1). ██████  ████████████████

████████████████████████████████████████████████████████.” (MA

PSR ¶ 107). ██████ experience is unfortunately not unique to those suffering from Lyme disease.

*See e.g.*, Meghan O'Rourke, *Lyme Disease Is Baffling, Even to Experts*, THE ATLANTIC (September

2019), https://www.theatlantic.com/magazine/archive/2019 /09/life-with-lyme/594736/, Ex. D,

Tab 4 (describing her experience suffering with Lyme disease, including severe memory lapses).

████████ was entitled to and obtained extra time, not based on any trickery, but on the merits

of her condition. (Dr. B. D. Raxlen Letter, Ex. C; M. Abbott Letter, Ex. A). The Abbotts were

motivated by a desire to help their circumstantially disadvantaged daughter, not heap privilege on

top of privilege. (M. Abbott Letter, Ex. A). While that desire ultimately led the Abbotts beyond

leveling the playing field to securing improper advantage, the difficult challenges their daughter

was facing help explain why two good and ethical people found themselves crossing a line they

would not have otherwise.

Third, Singer approached the Abbotts at a moment of maximum vulnerability. They were

living half a country apart with their marriage on the brink of collapse. (GA PSR ¶ 100; MA PSR

¶ 102; M. Abbott Letter, Ex. A; M. Luttrell Letter, Ex. B, Tab 24). While they tried to focus on

their children, they were full of doubts and recriminations about parenting. (GA PSR ¶100). While

Greg worked with Malcolm in New York, Marcia home-schooled ██████ in Colorado while

searching high and low for something, anything, that might address the chronic Lyme they now

knew was behind their daughter's medical woes. (G. Abbott Letter, Ex. A; M. Abbott Letter, Ex.

A).  Marcia was desperate to support ██████ in pursuing her dream to attend college under such

difficult conditions. (M. Abbott Letter, Ex. A). Greg was desperate to show his daughter support.

(G. Abbott Letter, Ex. A). Into this volatile mix walked Singer, a pied piper offering to make

everything better: to give ███ hope amidst a frustrating illness and help Greg heal a deepening family rift. Had the relationship been sound, Marcia muses in her letter, she and Greg may have each voiced their growing doubts about Singer and come to their senses. (M. Abbott Letter, Ex. A). But they were competing with each other, not talking to each other. It is no accident that Singer was able to extract more from the Abbotts for his illicit services than he was from any other set of parents.

> None of these circumstances excuse what Greg and Marcia did. As Greg writes in his letter:
>
> Yes, I was under intense daily pressure, yet there are millions of people with pressures who still play by the rules. To all those souls who struggle every day to put food on the table and to get their kids access to college, I apologize for any sense of resentment or inequity my actions provoked, and humbly ask forgiveness. (G. Abbott Letter, Ex. A).

And as Marcia says, "I take full responsibility for my poor decisions. I failed the daughter I was trying to help, and have also failed myself." (M. Abbott Letter, Ex. A). But these circumstances also make clear that the Abbotts were not sort of people who would have dreamed of cheating on an entrance exam in ordinary times. They went to Singer looking for a legitimate college counselor for their home-schooled daughter. (*Id.*). They were trying to help a very sick child who genuinely needed testing accommodations of the sort that Singer said from the outset he could help arrange. (*Id.*). Their personal relationship was on the brink and Singer seemed a salve for that too. (*Id.*). By the time it was clear that Singer was offering to guarantee their daughter would obtain certain scores walking away would have meant extinguishing the hope that was starting to be rebuilt. (*Id.*). Greg and Marcia know this is what they should have done. (G. Abbott Letter, Ex. A; M. Abbott Letter, Ex. A). Making the difficult but right decision is what they had been raised to do and had done time and again through their lives. This time, in these circumstances, Greg and Marcia failed

to live up to their high moral standards and committed the offense to which they have each pled guilty. (G. Abbott Letter, Ex. A; M. Abbott Letter, Ex. A).

The nature and circumstance of the offense, this perfect storm of marital, parental, and medical pressures, strongly support leniency in determining the appropriate sentence for Greg and Marcia. (18 U.S.C. § 3553(a)(1)).

D.     The History and Characteristics of the Defendants (18 U.S.C. § 3553(a)(1)).

Greg and Marcia's actions here arose out of their desire to help a resolute, hard-working, but gravely sick daughter, not their desire to game the system. The pressures that they faced merged with the opportunity presented by Singer. It is not their normal character. The more than 40 letters and statements in support of the Abbotts exemplify their true nature, as caring, loyal, and good people, putting further into context the truly aberrational nature of the offense. Accordingly, the "history and characteristics of the defendants" that must also be weighed at sentencing also support a sentence of probation.

In describing Greg, friends repeatedly noted his trustworthy nature. One friend, who has known Greg for over fifty years, described his "enormous confidence in asserting that the Greg Abbott I know is among the more honest, decent, selfless persons I have ever known. His honesty is so deep, I would entrust all that I own to his care, with no qualm or hesitation." (A. Napolitano Letter, Ex. B, Tab 28). In one instance, Greg "tried to organize an intervention" for a friend, when no other friends "stepped up to talk to him about getting a grip on things and giving up alcohol and drugs[.]" (M. O'Donnell Letter, Ex. B, Tab 29). Ultimately, the friend did stop abusing alcohol and drugs and "respects Greg enormously for making the original effort." (*Id.*).

Marcia too is known to family and friends alike as a woman of high moral character, focusing on doing the right thing and not the easy thing. Her daughter remembers the important

lessons in integrity her mother taught her and recalls Marcia "walk[ing] back 14 blocks in cold windy weather in order to return" socks accidentally put in Marcia's shopping bag. (H. Abbott Letter, Ex. B, Tab 1). ████ remembers her mother telling her that "We do not keep what is not ours." (*Id.*). Marcia's friends describe someone they would "trust with any part of my life, personal or financial." (J. Shield-Taylor Letter, Ex. B, Tab 35). Another friend agrees, stating that "Marcia is one of the only three people in this world whom I would trust with my life." (A. Christian Letter, Ex. B, Tab 6). She is a "Mother to the World" who "helped countless people in the Aspen community." (T. Fulton Letter, Ex. B, Tab 16).

For most of their adult lives, Greg and Marcia have been actively involved in giving back to others. The letters written on their behalf by friends evidence such generosity.[3] Greg, as one friend noted, "brings an incredible sense of purpose, honor, and generosity to all that he does[.]" (J. Sagansky Letter, Ex. B, Tab 33). Marcia's friend of 25 years says that "Marcia is the type who would give anything to help a person or animal in need, and is a big advocate of environmental causes. Those of us who are lucky to know her, know that the world is a better place because of her, and that we could use more women like Marcia." (M. Luttrell Letter, Ex. B, Tab 24). Even more admirable, the Abbotts try to avoid recognition for their service, as "[t]hey have helped a lot of people anonymously, seeking nothing in return." (J. Sutin Letter, Ex. B, Tab 37). Whether it

---

[3] In making a sentencing determination, a court may consider, as part of the 18 U.S.C. § 3553(a)(1) analysis, the defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others." (*United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (affirming a sentence of three months incarceration and 24 months supervised release from a recommended guideline sentence of 60 months imprisonment based in part on the defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others")). "Matters such as . . . charitable, or public service are not ordinarily considered under the Guidelines [but are] matters that § 3553(a) authorizes the sentencing judge to consider." (*United States v. Rita*, 551 U.S. 338, 364-65 (Stevens, J., concurring); *see also United States v. Ali*, 508 F.3d 136, 150 & n.19 (3d Cir 2007) (upholding downward departure where the defendant, inter alia, "helped organize fundraising banquets for the [school where she worked], contributed her 'personal assistance from leading to scrubbing floors,' spent several hours 'counseling and comforting' a student's parent who was struggling to overcome drug-addiction, and became the 'legal guardian' to two nieces to ensure that they attended better schools." (record citation omitted))).

was Greg's involvement in the development and growth of IDC, (*id.*), or Marcia's involvement with English in Action or bringing awareness to elephant poaching, (T. Fulton Letter, Ex. B, Tab 16), the Abbotts have been dedicated to giving back to their community. They also opened their Colorado home to disadvantaged and sick children through the Silver Linings Ranch. (R. Gould Letter, Ex. B, Tab 17).

Numerous letters testify to just how out of character the instant offense was. A childhood friend describes growing up with Marcia that, "she was always the one with the high standards, the one who went the extra mile[.]" (J. Elmlinger Letter, Ex. B, Tab 14). Similarly, Greg's friends know him as "a smart man who always want to help, whose love for his daughter blinded him, about all he wants was to help his lovely daughter surpass a lousy disease." (F. Bajovic Letter, Ex. B, Tab 3). Greg's and Marcia's actions showed "weakness at an extremely difficult, pressurized moment, to help their sick daughter[.]" (H. Koller Letter, Ex. B, Tab 21). As another noted, "They've been through a lot over that past 2-3 years. We would all do anything for our children, especially when their daughter's life was made so difficult from illness. These are really kind, generous, decent people who made a mistake in the name of love." (K. Montgomery Letter, Ex. B, Tab 26). Greg's friend, J. Cobler writes, "[O]n balance, as a man of high moral fiber he deserves extreme leniency for a mistake made under these most trying of circumstances, not from any sordid need for bragging rights but only from the perfectly natural desire to do the best he could for his child to help her achieve her goals." (J. Cobler Letter, Ex. B, Tab 8 (internal quotations omitted)). Marcia's sisters writes, "Marcia has always been a gentle, humble woman who was shown compassion and understanding for her fellow humans. It is my hope that she might be shown the same compassion and understanding at this time." (G. Corning Letter, Ex. B, Tab 10). She "is first

and foremost a giver," who "gives with her whole being.  (U. Parker Letter, Ex. B, Tab 31; A. Christian Letter, Ex. B, Tab 6).

The Court should also consider the Abbotts' behavior as entirely aberrational.[4] Statements from those who know them best illustrate the uniqueness of the situation that led to Greg and Marcia to commit this crime. Never before had they committed similar offenses. In describing Greg, friends have called him "trustworth[y]," having integrity, "exceptionally selfless," and "the most honest, decent, and selfless person I have ever known." (J. Cobler Letter, Ex. B, Tab 8); (A. Napolitano Letter, Ex. B, Tab 28). Marcia's friends and family describe her as a  "a person of exceptionally high integrity."  (A. Christian Letter, Ex. B, Tab 6). They know that "her priorities are deep, solid, and of the highest integrity."  (A. Casey Letter, Ex. B, Tab 5). She is "gentle soul" who "gives her heart" to others (A Casey Letter, Ex. B, Tab 5; J. Elmlinger Letter, Ex. B, Tab 14). ▆▆▆▆ Abbott describes learning from her mother that, "that it was a blessing to be able to help others." (H. Abbott Letter, Ex. B, Tab 1). As demonstrated by the letters submitted on their behalf, the Abbotts' general character does not indicate criminal tendencies or a likelihood to repeat the criminal conduct.

Additionally, the potential incarceration of the Abbotts even for a short time would likely have serious collateral consequences for their family. Both Malcolm and ▆▆▆▆ rely completely on their parents, although in different ways. Malcolm has been able to stay grounded through the assistance of his father. Currently, Malcolm is living at home with Greg. If Greg were to be incarcerated, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. Recently, Malcolm has made

---

[4] The First Circuit considers aberrant behavior based on "the totality of circumstances," which includes consideration of factors including "pecuniary gain to the defendant, charitable activities, prior good deeds, and efforts to mitigate the effects of the crime[.]" (*United States v. Germosen*, 473 F. Supp. 2d 221, 227-28 (D. Mass. 2007) (citing *United States v. Grandmaison*, 77 F.3d 555, 563 (1st Cir. 1996))). "In effect, the First Circuit's focus was on situating the offense in the context of the offender's life, asking whether this offense was a "marked departure from the past and is unlikely to recur." (*Germosen*, 473 F. Supp. 2d at 228).

great progress, but it needs to continue. Similarly, ███ depends significantly on the care provided by her mother. (H. Abbott Letter, Ex. B, Tab 1). "Her daughter is . . . fully dependent on her for support, and absolutely needs her mother and her strength during this time." (D. White Letter, Ex. B, Tab 41). At times, her Lyme disease has debilitating consequences that require Marcia help keep track of ███ medication, meals, and general well-being. (H. Abbott , Ex. B, Tab 1). She takes her to all of her doctors' appointments and oversees her care. (*Id*.). The potential incarceration of the Abbotts would have a debilitating effect on their family, and not just by their general absence.

    E.    The Need for the Sentence (18 U.S.C. § 3553(a)(2)).

Section 3553(a)(2) requires the Court to consider "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." These factors all weigh in favor of leniency for Greg and Marcia.

The offense of course is a significant one and punishment is surely in order, but the exceptional circumstances that led the Abbotts into their relationship with Singer along with the consequences they have already faced and will continue to face demonstrate incarceration would be unwarranted here.

    The Abbotts have had their lives turned upside-down as a result of their decision to allow Singer to coordinate for Ridell to change ███ test answers. Now, they have been followed by reporters and paparazzi, as have their children, and have received vicious hate mail. They have been put under a microscope with national newspaper articles naming them as participants in the

"largest college admissions scam ever prosecuted by the Department of Justice." (DOJ Press Conference, Mar. 12, 2019). Because of this case, Greg stepped down from his position at IDC, threatening the viability of his 20-year, humanitarian labor of love. Greg and Marcia are not celebrities whose lives who ride the highs and lows of public approval, but private people whose fifteen minutes of fame is a spotlight on the most difficult chapter in their lives. In the world of Google searches it may be the only chapter many people see in perpetuity. Their innocent daughter will suffer in this way too, a painful fact that the Abbotts must live with.

Understanding the basis for this offense and the resulting impact on the Abbotts' lives since they were charged, there is no indication that either would commit another crime. As a result, a harsher sentence is not needed to "afford adequate deterrence," or "protect the public from further crimes of the defendant." (18 U.S.C. § 3553(a)(2)(A) – (C)). Neither of the Abbotts has any prior criminal record, and their conduct at issue here only arose because of the particular extraordinary circumstances surrounding the offense.

Finally, the cost of incarcerating the Abbotts outweighs the benefit and is unwarranted in consideration of all of the other sentencing factors.[5] The fact that the Abbotts and other parents were arrested is sufficient to deter other families seeking to commit the same crime. Some parents have been incarcerated to date and others too may ultimately receive sentences of incarceration based on the particulars of those cases, but it is not necessary that each of the 43 parents charged to date receive jail time for general deterrence to operate. The arrests and the exposure of the scheme has heightened review of the college application process and standardized testing system. The ubiquity forced examination of the cost of trying to work the application system, with acceptances being revoked to children involved in the scheme, to other parents. Time in prison

---

[5] The Court may consider the cost of incarceration as balanced against the benefit of incarceration for deterring future actors. (*United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012)).

would not provide sufficient additional deterrence to outweigh the cost of such incarceration to the Abbotts. Removing the Abbotts from their children may have significant consequences on the health and well-being of ███████ and likely Malcolm as well, who is currently in a period of sobriety. Further, there is little risk of recidivism for Marcia or Greg. They profoundly feel the repercussions of their actions and will not repeat their mistakes.

Therefore, the factors considered by the Court under 18 U.S.C. § 3553(a)(2) all weigh in favor of a lenient sentence.

> F.   Sentencing Guidelines Ranges (18 U.S.C. § 3553(a)(4)).

The Sentencing Guidelines Range determined by the Probation Department and adopted by this Court – a range of 0-6 months imprisonment – is consistent with the other sentencing factors in supporting a sentence of probation. The Sentencing Guidelines Range set forth in the Plea Agreement – a range of 12-18 months imprisonment – by contrast  would be worth little weight in the sentencing analysis even if it had been adopted by the Court.

Greg and Marcia, like the other parents in this case, wanted to plead guilty and accept responsibility promptly in this case and, like the parents, pled guilty pursuant to a Plea Agreement driven entirely by the amount of money Singer collected from the parents. Singer appears to have paid the proctors who performed the cheating about the same amount: $10,000 per student per test, as he did for the Abbotts.  (GA PSR ¶ 28(d)). But the price Singer charged parents varied wildly, from a low of the $15,000 he charged Felicity Huffman to the $75,000 he charged the Abbotts for the SAT subject matter test administered in October 2018. Accordingly, the Plea Agreement Guidelines range was driven by the amount Singer collected.

The Government, while now taking the position that the Abbotts should be sentenced to 9 months rather than 12, is still focused on the amount the parents paid Singer in the college entrance

exam scheme as the best proxy for relative culpability. The fact that Singer charged Felicity Huffman "only" $15,000 for services he charged other parents $50,000 or more drives the Government's sentencing positions, with recommendations ranging from 1 month to 9 month for parents involved in the admissions test scheme based solely on the amount of money Singer was able to charge. Yet Singer's wildly varying prices for the same services say much more about his ability to extract as much money as possible from parents, depending on the circumstances. The Abbotts were willing to pay Singer's high asking price for two reasons. First, they had their own charitable foundation that had contributed to various causes and believed Singer's apparent lies that his own foundation helped underserved children. While they knew that they would be receiving improper benefits in return for a contribution, their relative generosity to a charity they assumed was real certainly should not result in a higher sentence. A friend recalls Marcia being, "thrilled that he worked for donations, and that Greg's foundation would go toward underprivileged children and schools." (M. Luttrell Letter, Ex. B, Tab 24). Second, as discussed in section I.C, Singer met the Abbotts at a uniquely opportune time to set his price. Marcia knew that whatever price Singer asked would have to go through Greg and his foundation, and, with marital troubles at a height, expected Greg to be the one to push back on price. Greg in turn knew that if he refused to pay what Singer wanted, he'd risk further estranging his relationship. Ultimately, the amount parents paid Singer says nothing of value about their relative culpability in the offense.

      G.     <u>The Need to Avoid Unwarranted Disparity (18 U.S.C. § 3553(a)(6)).</u>

While the Court has determining that a 14 day jail term sentence was appropriate for Felicity Huffman, the Abbotts respectfully request that the Court consider a variation based on the justified factors of (1) their situation when they met Singer and (2) the hardship the Abbott children

would suffer if their parents were to serve time in jail. Like with others of Singer's victims, the Abbotts used his services to benefit one of their children. Here, both parents engaged in the similar behavior with Singer for which other families only had one spouse participate. Now, in the Abbott family, both parents will be felons, both parents will need to serve their sentence. Section 3553(a)(6) calls for the Court, in fashioning its sentence, to consider "the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct."

      H.    <u>Alternatives to Prison Sentence include Community Service (18 U.S.C. § 23553(a)(3)).</u>

The above analysis shows that the Abbotts should not face a prison sentence. Pursuant to § 3553(a), however, the Court may consider other "kinds of sentences available." Because the Abbotts fall into Zone A of the Sentencing Table, the Court may find it appropriate to impose a period of community service, the Court should seriously consider such alternative sentences for the Abbotts.

The wide endorsement of community service by both federal and state courts can be attributed to individual judges who recognize that it "is a burdensome penalty that meets with widespread public approval, is inexpensive to administer . . . produces public value . . . and . . . can to a significant extent be scaled to the seriousness of crimes." (Michael Tonry & Mary Lynch, *Intermediate Sanctions*, 20 CRIME & JUST. 99, 124 (1996)). Similarly, a 2005 publication of the Administrative Office of the U.S. Courts described community service as "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community. It is practical, cost-effective, and fair — a 'win-win' proposition for everyone involved." In selecting an appropriate candidate to perform community service, U.S. Probation and Pretrial Services recommends that courts "can use community service successfully . . . for offenders with personal

and social stability, who are willing, motivated, and who have no history of violence." Needless

to say, the Abbotts fit that description perfectly.

Community service can serve as a significant sanction. In a financial fraud case, Judge

Gleeson sentenced a defendant whose conduct led to a $110 million loss to community service:

> [N]othing should ever be out of bounds . . . and I conclude that a sentence
> that doesn't include incarceration is appropriate here. Alternatives to
> incarceration exist that can carry both the community and this Court's
> condemnation of your conduct but channel it in a way that's more
> constructive, given your significant charitable works and contributions
> before this case, given the extraordinary timing of your cooperation and its
> nature, given your age and your physical circumstances. I don't think the
> goals of sentencing here require you to be incarcerated. (*United States v.
> Shamilzadeh*, 04-cr-194 (JG) (E.D.N.Y. Apr. 1, 2008)).

Here, given the differing troubles involving two of their children, the Court should consider

home confinement or community service, which would permit the Abbotts to remain part of their

family while also providing an adequate, and significant, punishment for the Abbotts. It would still

constitute a loss of liberty and hardship for them, and would serve as a deterrent to others. The

Abbotts' good works, community contributions, and generosity outweigh their criminal conduct.

They are also both first-time offenders and are, and always have been, highly motivated to serve

their community. These factors make them perfect candidates for community service as a

substitution for incarceration.

Incarcerating the Abbotts will do little to help their community or their family. It also would

not serve as any more significant of a deterrent to others who have considered committed the same

crime as they did. Instead, substituting home confinement and/or community service with any

incarceration would create a greater benefit overall, while still maintaining the goals and aims of

sentencing.

Using Marcia's experience and professional history in English and writing by ordering her to serve a meaningful period of community service will benefit the community. Marcia has identified several organizations that she could bring her existing experience and knowledge to benefit: Raising a Reader, Literacy Outreach, Roaring Fork Pre-Collegiate Yampah Mountain High School, and the Aspen Buddy Program. These organizations need volunteers with the experience Marcia has serving youth and working with children. She could fill that need without wasting organizational resources onboarding new volunteers while continuing to attend to her daughter's illness. Ordering her to serve a substantial period of community service will benefit these organizations and contribute to the community.

The community can similarly benefit from community service on behalf of Greg. Greg's demonstrated successes in multiple industries, and his decades of experience supporting charitable organizations would make him an invaluable volunteer for any number of community organizations, including the Aspen "Buddy" Program. Instead of draining resources incarcerated, Greg could provide advantages to his community.

## CONCLUSION

In light of the unique circumstances surrounding the offense, their full and fast acceptance of responsibility, and their individual roles as caretakers for their children, Greg and Marcia Abbott respectfully seek an appropriate sentence of probation with community service.

Dated: October 1, 2019                    Respectfully submitted,

                                       /s/ Daniel L. Stein

                                       Daniel L. Stein (Admitted *Pro Hac Vice*)
Mayer Brown LLP
1221 Avenue of the Americas
New York, New York 10020
Dstein@mayerbrown.com
Tel: (212) 506-2646

*Attorney for Defendant Gregory Abbott*

/s/ Arlo Devlin-Brown

Arlo Devlin-Brown (Admitted *Pro Hac Vice*)
Katherine P. Onyshko (Admitted *Pro Hac Vice*)
Covington & Burling LLP
620 Eighth Avenue
New York, New York 10018
Adevlin-brown@cov.com
Tel: (212) 841-1046

*Attorneys for Defendant Marcia Abbott*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 1, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.

Dated: October 1, 2019

*/s/ Daniel L. Stein*
Daniel L. Stein