1          UNITED STATES DISTRICT COURT
2              DISTRICT OF MASSACHUSETTS

3    * * * * * * * * * * * * *
    UNITED STATES OF AMERICA      *
4                                 *    CRIMINAL ACTION
             v.                   *    No. 19-10117-IT-1, 2
5                                 *
    GREGORY ABBOTT and            *
6    MARCIA ABBOTT                 *
    * * * * * * * * * * * * *
7

8

9          BEFORE THE HONORABLE INDIRA TALWANI
              UNITED STATES DISTRICT JUDGE
10                    DISPOSITION
                 October 8, 2019
11

12   APPEARANCES:

13        UNITED STATES ATTORNEY'S OFFICE, (By AUSA Eric S.
     Rosen and AUSA Justin D. O'Connell) 1 Courthouse Way,
14   Suite 9200,  Boston, Massachusetts  02210, on behalf of
     the United States of America
15
          MAYER BROWN, LLP, (By Daniel L. Stein, Esq.) 1221
16   Avenue of the Americas, New York, New York  10020, on
     behalf of Gregory Abbott
17
          COVINGTON & BURLING, (By Arlo Devlin-Brown, Esq.)
18   The New York Times Building, 620 Eighth Avenue, New
     York, New York 10018-1405, on behalf of Marcia Abbott
19

20
                              Courtroom No. 9
21                            1 Courthouse Way
                              Boston, Massachusetts 02210
22

23          James P. Gibbons, RPR, RMR
               Official Court Reporter
24        1 Courthouse Way, Suite 7205
           Boston, Massachusetts  02210
25           jamesgibbonsrpr@gmail.com

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  All rise.
 3        (Whereupon, the Court entered the courtroom.)
 4            THE CLERK:  Court is open.  You may be seated.
 5        United States District Court is now in session, the
 6   Honorable Indira Talwani presiding.
 7        This is case No. 19-cr-10117, United States versus
 8   Gregory Abbott and Marcia Abbott.
 9        Would counsel please identify themselves for the
10   record.
11            MR. ROSEN:  Good afternoon, your Honor.  Eric Rosen
12   and Justin O'Connell for the government.
13            THE COURT:  Good afternoon.
14            MR. O'CONNELL:  Good afternoon.
15            MR. STEIN:  Good afternoon, your Honor.  Daniel
16   Stein for Gregory Abbott.
17            THE COURT:  Good afternoon.
18            MR. DEVLIN-BROWN:  And good afternoon, your Honor.
19   Arlo Devlin-Brown for Marcia Abbott.
20            THE COURT:  Good afternoon.
21        We are here for sentencing, and I will start with the
22   documents I have received and read here.
23        I have the separate presentence reports for both
24   Mr. and Ms. Abbott, prepared September 3, 2019, and revised
25   October 1, 2019.  I do not have a sentencing recommendation
```

 1    from the Probation Office, per the government's objection;

 2    The government's memorandum regarding methodology for

 3    calculating gain or loss under the Guidelines, and that was

 4    Docket 420, amended at 422; Probation's submission in

 5    response to my order at 440 -- or in response to my order;

 6    and then my memorandum and order addressing those matters at

 7    443; the government's sentencing memorandum as to all

 8    defendants, that's at 423, filed September 6; and a joint

 9    sentencing memorandum as to  Mr. and Ms. Abbott, filed

10    October 1.  I have defendants' joint sentencing memorandum,

11    and I guess there's a redacted version on the docket.  I

12    have reviewed the unredacted version.

13        And then there are exhibits, some sealed, at Exhibits

14    A, B, C, and D, which included a number of subdocuments

15    within that.

16        Victim impact statements, I guess I have in my folder

17    here, are the ones from ACT, College Board, and ETS.  And of

18    those, are all three relevant?  No, just --

19            MR. ROSEN:  Certainly.  They are all relevant, yes.

20            THE COURT:  Thank you.

21        To my knowledge there's no other material that's been

22    submitted by the parties; is that correct?

23            MR. STEIN:  Yes, your Honor.

24            MR. DEVLIN-BROWN:  Yes, your Honor.

25            THE COURT:  And, Probation, was any information

1    withheld from the presentence report pursuant to Rule

2    32(d)(3)?

3              PROBATION OFFICER:  No, your Honor.

4              THE COURT:  Mr. Rosen, any witnesses or victims

5    present?

6              MR. ROSEN:  No, your Honor.

7              THE COURT:  And to defense counsel, let me go

8    through with each of you, have you had an opportunity to

9    review all the material submitted in connection with the

10   sentencing?

11             MR. STEIN:  Yes, your Honor.

12             MR. DEVLIN-BROWN:  Yes, your Honor.

13             THE COURT:  And have you had a chance to go over it

14   with the defendants?

15             MR. STEIN:  Yes, your Honor.

16             MR. DEVLIN-BROWN:  Yes, your Honor.

17             THE COURT:  And, Mr. Abbott, have you had a chance

18   to review the material that was submitted in connection with

19   sentencing?

20             DEFENDANT GREGORY ABBOTT:  Yes, your Honor.

21             THE COURT:  And have you had a chance to discuss it

22   with your counsel?

23             DEFENDANT GREGORY ABBOTT:  Yes, I have.

24             THE COURT:  And, Ms. Abbott, have you had a chance

25   to review all the material?

1            DEFENDANT MARCIA ABBOTT:  Yes, I have.

2            THE COURT:  And have you had a chance to discuss it

3      with your counsel?

4            DEFENDANT MARCIA ABBOTT:  Yes, your Honor.

5            THE COURT:  And, defense counsel, were you

6      expecting any evidentiary hearing or have any witnesses to

7      present?

8            MR. STEIN:  No, your Honor.

9            MR. DEVLIN-BROWN:  No, your Honor.

10           THE COURT:  So with that I will turn to the

11     presentence reports, and I'm going to try and do both of

12     these together.

13         In the section on the defendants' conduct, that's

14     Paragraphs 34 to 64 in each of the presentence reports,

15     there were objections one through four by the defendants,

16     and they appeared to have been addressed by Probation; is

17     that correct?

18           MR. DEVLIN-BROWN:  On behalf of Marcia Abbott, yes,

19     your Honor.

20           MR. STEIN:  Yes, on behalf of Gregory Abbott as

21     well.

22           THE COURT:  Okay.

23         And then the next set of objections are all by the

24     government.

25         With regard to the victim impact statement, that's

1    Objection One.

2        And the offense level computation, Objections Two

3    through four.

4        And then further objections relating to custody, impact

5    of a plea agreement, probation, and fines.  So this is

6    Government Objections One through Eight, and I believe I

7    have addressed all of those in the order.

8        MR. ROSEN:  That's correct.

9    We just -- you know.

10        THE COURT:  Reserve your objections there.

11        Just to be clear, what we're talking about here, the

12    government, under the Guidelines -- the government's

13    objection here is that the guideline calculation should be

14    based on the amount of money of this transaction, and that's

15    my disagreement with that, and we can discuss it when we get

16    to the appropriate guideline fine.

17        But, at any rate, none of those objections need to be

18    addressed at this time any further, noting the government

19    continues to object on those grounds.

20        And then the last, sort of, objections regarding the

21    offender characteristics, I had Mr. Abbott's Objections 5

22    through 13, and Ms. Abbott's Objections 5 through 8.

23        I believe they were all addressed by the probation

24    officer.  Anything further?

25        MR. STEIN:  No, your Honor.  They were all

1  addressed.

2       MR. DEVLIN-BROWN:  And the same for Marcia Abbott,

3  your Honor.

4       THE COURT:  Okay.

5     So, with that, I am going to turn to the Guideline

6  calculation.

7     The base offense level here for a violation of 18

8  U.S.C. Section 1349, based on the substantive offenses of

9  mail fraud and honest services mail fraud, gets us to a base

10  offense level of 7.

11     For purposes of the Sentencing Guidelines, I found no

12  enhancement based on the amount of the transaction, despite

13  the government's arguing for that, resulting, in my view, in

14  an adjusted offense level of 7; a two level decrease for

15  acceptance of responsibility, and a total offense level

16  of 5.

17       Any objections to that not previously noted?

18       MR. ROSEN:  No, your Honor.

19       MR. STEIN:  No, your Honor.

20       MR. DEVLIN-BROWN:  No, your Honor.

21       THE COURT:  And then for each of the defendants

22  with regard to criminal history, neither defendant has any

23  prior criminal history, so we have zero criminal history

24  points.  Criminal History Category is, therefore, I.

25       So, sentencing options, as I have calculated the

1    Guidelines are total offense level 5, Criminal History

2    Category I.

3         Under the statute, custody is not more than 20 years.

4    Under the Guidelines, it would be zero to six months.

5         Under the statute, supervised release of not more than

6    three years; Guidelines, one year to three years.

7         Under the statute, probation for one to five years;

8    Guidelines, not more than three years.

9         Under the statute, fine of not more than $250,000;

10   under the Guidelines, fine of 500 to 9,500.

11        Restitution is not at issue in this case, and special

12   assessment of $100.

13        Any disagreement with those calculations?

14             MR. ROSEN:  No, your Honor.

15             MR. STEIN:  No, your Honor.

16             MR. DEVLIN-BROWN:  No, your Honor.

17             THE COURT:  So with that, I will start with the

18   government's recommendation.

19             MR. ROSEN:  May I use the podium, your Honor?

20             THE COURT:  Certainly.

21             MR. ROSEN:   Judge, the Abbotts are the only

22   defendants before the Court who engaged in the college

23   entrance exam cheating scheme more than once.  In fact, they

24   did it twice.  They used the fraudulent scores in an attempt

25   to gain entrance for their daughter to Duke University in

1   the place of another deserving student.

2          THE COURT:   Meaning they applied to Duke?

3          MR. ROSEN:   Yes, they applied to Duke, using the

4   scores.

5          They paid Singer, through his foundation, $125,000 to

6   participate in the schemes, more than anyone else solely

7   involved in the testing.

8          Because of this, the government respectfully requests a

9   sentence of eight months in prison.

10         Now, the Court, of course, has heard many of the

11   arguments we've made in prior sentencings, so I'm going to

12   keep this somewhat brief.

13         Your Honor has asked in previous sentencings about how

14   defendants compare among these group of eleven parents who

15   have pled guilty before this Court.   The Abbotts are among

16   the more culpable defendants for a number of reasons.

17         First, the fact that the Abbotts did it twice is

18   important.   Obviously it cost more money, $125,000 versus

19   15,000 that Felicity Huffman Paid or 75,000 that Gordon

20   Caplan paid.

21         This is a reflection of what those scores were worth to

22   them.   They made those payments directly to Singer's

23   charity.

24         And while the Abbotts write in their brief that they

25   believed that the charity was at least somewhat legitimate,

that's beyond the point here.  The point is that the Abbotts
knew that their own payments were not and that the charity
was being used to funnel and launder the proceeds for their
bribe money to pay for the cheating.

The double cheating also gave the Abbotts additional
insight into how this scheme worked; the fact that Rick
Singer really did control a testing center; the fact that he
could get them any score they wanted on any exam; the fact
that they had to trick their own daughter twice in order to
have her take the exam thousands of miles from their home.

Cheating and bribery became a crutch and a pattern for
the Abbotts.

The fact that they did it twice demonstrates an air of
invincibility, a true lack of right or wrong.

The fact that they did it twice shows their ultimate
goal was not just to get a decent score, but to get a highly
specific score, a score that could get their child into Duke
and thus steal a spot from a deserving student.

And the fact that they did it twice increased their
daughter's odds of displacing another more-qualified student
to Duke.  A near-perfect ACT score, when coupled with
near-perfect SAT II subject test scores, made her even more
qualified, albeit through fraud, than other students.

What else sets the Abbotts apart?

Every parent who participates in the scheme is

obviously brazen, but the Abbotts rank up there as perhaps

some of the more brazen amongst them.

Felicity Huffman wanted her daughter scores to be good,

to be competitive, to allow her to compete, so they raised

it by a few hundred points.

For Gordon Caplan, he was satisfied with a score of a

32, a good score, but not a world-class score.

For the Abbotts, they wanted to win, to crush the

competition.  They bought their daughter a 35 on the ACT, a

score in the top 1 percent, nearly a perfect score.  They

weren't trying to get her in the ballpark; they were trying

to win the game.  A 35 is designed to knock others out of

the competition.  It's designed to tell admissions officers

that you're really, really qualified; and, most importantly,

a 35 is meant to impart to the admissions officers at Duke

University that that slot, that admission slot, that's mine.

And then they did the same thing on the subject tests.

They weren't going for decent scores.  They wanted the

nearly perfect scores, an 800 in the math, a 710 on the

literature.

Are there other aggravating factors?

Well, after the SAT II subject tests, Marcia Abbott

threatened legal action against the College Board.

You see, Judge, after the subject tests were taken, the

College Board didn't score her test, mostly because the

1   scores were much higher than what they were before.

2       Marcia Abbott actually herself thought this was a

3   reason.  She texted Rick Singer that she, Was scared that if

4   she did way better this time they would flag her.

5       So what did she do?  She called the College Board,

6   threatened legal action.  She lied about her scholarship,

7   attempted to shift blame to the College Board for missed

8   opportunities.

9       You learn a lot about someone when they are confronted

10  with an issue like this.  Do we double down, or do we go

11  home?

12      Here, Marcia Abbott, faced with this quandary, chose to

13  double down and claim the property, the scores, that were

14  rightfully hers.

15      And what about Greg Abbott?

16      He paid the bribe money right out of his own foundation

17  account $125,000 that could have gone to real charitable

18  purposes and instead was earmarked for self-promotion.  And

19  after his arrest, right after he got out of jail, he gave a

20  statement to the Wall Street Journal denying all

21  responsibility for crimes that he pled guilty to weeks

22  later.

23      And what about the crimes themselves?  What did the

24  Abbotts say on the phone when they didn't think anybody was

25  listening?

1      Now, I realize your Honor discussed at a prior

2 sentencing that you punish for the crime the defendant

3 committed and not so much for what they say or do during the

4 crime.  And that may be so, but the government believes that

5 what a defendant does or says during the crime is an

6 important reflection on their history and characteristics,

7 which is, of course, a 3553(a) factor.

8      So what do we have here?

9      The Abbotts took a very transactional nature to their

10 participation in the testing schemes.  For the Abbotts, they

11 purchased a service, ACT and SAT II cheating.  They paid the

12 money, and they wanted to get what they paid for.  For the

13 Abbotts, there were no twinges of remorse, no hemming and

14 hawing over whether this was a good idea.  There was just

15 simply, Here's my money.  Let's get it done.  And when they

16 didn't get what they wanted, all options, including legal

17 options, were on the table.

18      For the Abbotts, the calls indicate that very little

19 was off limits to them morally or ethically, the only

20 limiting factor through what they could afford.

21      Your Honor, this is one the few testing schemes where

22 the evidence shows that the Abbotts truly wanted to steal a

23 spot at a specific elite college for themselves, in this

24 case Duke.

25      Their methodology was brazen.  Their willingness to

1      shoot for the moon displayed a remarkable callousness that

2      is not present with many of the other defendants, and it is

3      for this reason that the government respectfully asserts

4      that a sentence of eight months is sufficient but not

5      greater than necessary for both Abbotts.

6          Thank you.

7              THE COURT:  So, we start with the fundamental

8      disagreement here on sentencing, in that the government

9      views the guideline calculation that I have done to be

10     incorrect.

11             MR. ROSEN:  That is correct.

12             THE COURT:  That said, I'm making the decision here

13     on how to sentence the people behind me based on my

14     understanding of the law and the Guidelines.  So while the

15     government may disagree with my analysis, that's the world

16     that I am sentencing in.

17         So, within that framework, recognizing that you

18     disagree, it's not as helpful as it could be to simply have

19     you sort of double down and give me different reasons for

20     the sentence you originally had calculated.  And it would be

21     far more helpful to explain to me how the government

22     previously had recommended the identical sentence for

23     Mr. Caplan as for these two defendants, recognizing that you

24     don't like the sentence --

25             MR. ROSEN:  No.

1      THE COURT:  -- I've imposed for Mr. Caplan.

2  Nonetheless, why should I impose a different sentence here

3  than for Mr. Caplan, other than sort of rearguing the point?

4      MR. ROSEN:  Well, the difference between Caplan --

5  Caplan and the Abbotts are really, I think, fundamentally

6  different because, I think from our sentencing memo and the

7  factors we considered, we considered his Chairmanship of

8  Willkie Farr, to be a significant aggravating factor, even

9  though the amount of money he paid was less, even though he

10  only did it once.

11      THE COURT:  Well, isn't it essentially that the

12  government took the number of dollars, came up with a rubric

13  based entirely on the number of dollars, and now that I've

14  said the number of dollars isn't the operative one, you're

15  sticking to the same numbers but using different rationales

16  with each of the defendants?

17      MR. ROSEN:  Your Honor, we're sticking to the same

18  numbers because we believe that the recommendations we made

19  initially were fair and correct, and were actually in some

20  cases much less than the Guidelines as agreed to by the

21  parties.  We continue to believe that now.  We think that

22  the recommendations are within the public interest.  And our

23  recommendations, you know -- and I understand the Court

24  doesn't like or adopt them, but we believe we have to be

25  true to the recommendations that we are making.

1          THE COURT:  So, if I were to sentence these two

2     defendants as the government wants to eight months, would

3     that be, in your view, appropriate in light of the sentences

4     that I've imposed for Mr. Caplan, who you had the same

5     recommendation for initially, Mr. Sloane, Mr. Semprovivo and

6     Mr. Huneeus, all of whom you had recommended a much higher

7     sentence than for these defendants?

8          MR. ROSEN:  It would be appropriate in the light of

9     the recommendations that we made, your Honor.

10         I mean, we continue to make recommendations that we

11    feel are fair and appropriate, and we're going to continue

12    to do that.

13         Your Honor, of course, has, you know, has her cards,

14    and we understand that the -- you have the ultimate power,

15    but --

16         THE COURT:  But not just the ultimate power, but

17    the obligation to sentence the group of people in front of

18    me considering the same factors, et cetera.

19         If I were to now say, You know what, I'm going to

20    switch horses here and simply start imposing the sentences

21    the government's asking for, that wouldn't give me the same

22    sense of relative fairness between the group of people in

23    front of me.

24         MR. ROSEN:  Right.

25         Well, we're not going to lower the sentencing

1  recommendations here.  For one reason, I also think it's not

2  fair to the people who already pled out and just had the

3  disadvantage or advantage, in some cases, of being sentenced

4  first.  I don't want to take -- you know, recommend

5  something for them and then sort of try to game it within

6  what I think the Court feels is appropriate.

7        We're making recommendations, Judge, with what we feel

8  is appropriate for the public interest and what we feel is

9  fair and appropriate.

10       And also, there's 11 parent defendants before your

11  Honor.  There are 19 with Judge Gorton.  So we have to be

12  consistent amongst all the judges and not try to, I think,

13  shift our recommendation by what we feel the court in a

14  particular session will do.  And I think that's fair and

15  appropriate, and I think it's important for the government

16  to maintain consistency.

17             THE COURT:  Okay.

18             MR. ROSEN:  Okay.  Thank you.

19             THE COURT:  Thank you.

20       Counsel, whichever one wants to proceed first.

21             MR. STEIN:  Thank you, your Honor.

22       May I use the podium as well?

23             THE COURT:  Certainly.

24             MR. STEIN:  Your Honor, I plan on addressing some

25  of the general points made by the government and that we

1   would make on behalf of both Mr. and Mrs. Abbott.  I will

2   then address some circumstances that I think are specific to

3   Mr. Abbott, and then my colleague, Mr. Devlin-Brown, will

4   address the Court again on a mix of general issues and

5   specific issues.

6         THE COURT:  Okay.

7         MR. STEIN:  I want to begin by responding to some

8   of the points made by the government just now.  I fear that

9   what the government has done is presented a picture of the

10  case as if the only thing that exists in the world are the

11  recordings that they have with Mr. Singer.

12        They say there's no hemming and hawing, no agonizing,

13  no moral questioning of this decision because they didn't

14  have it on their tapes.

15        Your Honor, there is much more in the world.  There's

16  much more that goes on in a person's life than what

17  government happens to have on tape.  And to limit it to that

18  is really not taking a fair and accurate picture of this

19  offense or of these defendants.

20        With respect to Mr. Abbott, the government points to a

21  statement that was printed in the Wall Street Journal.  We

22  don't know where that statement came from.  Mr. Abbott has

23  told me many times since the day it appeared that he's never

24  spoken to the Wall Street Journal.

25        You know, I don't know what else to say about that, but

1     to hold him accountable for something the Journal published

2     doesn't seem --

3              THE COURT:  Well, until the government meets its

4     burden of -- evidentiary burden, if they want me to consider

5     something, I would need to have it.  I don't have an

6     evidentiary source for the statement that's being made.

7              MR. ROSEN:  I do have a copy of the article.

8              THE COURT:  But an article that quotes somebody is

9     and out-of-court statement that I have no indicia of

10    reliability on, do I?

11             MR. ROSEN:  Well, I respectfully disagree.  I think

12    the Journal is highly reliable, and I don't think they would

13    have printed it without -- without --

14             THE COURT:  Without what?

15             MR. ROSEN:  -- without vetting it, Judge.

16        I think hearsay is appropriate, and you can give

17    whatever weight you want to it, but I'm just saying I have a

18    copy of the article.

19             THE COURT:  I thank you for the proffer of the

20    article.

21        I'm not considering what was reported by the Wall

22    Street Journal.  If counsel wanted to produce that on a

23    basis that I could consider in an evidentiary matter, there

24    would be a different way to present that.  So I'm not

25    considering the Wall Street Journal statement.

1          MR. STEIN:  Thank you, your Honor.

2          With respect to the other factors that we would

3    respectfully submit the Court should consider, the

4    government emphasized the amount paid and the number of

5    times that this was done.  And I'll address those factors in

6    a moment, but I think there are other factors the government

7    skipped over.

8          This was a case which involved only admissions testing.

9    The Abbotts were never involved in the athlete recruitment

10   scheme.

11         They did not involve their child in the offense.  I

12   find it interesting that in many of the other sentencings

13   the government has pointed to that as an aggravating factor,

14   that the child was involved; and here, all of a sudden, not

15   involving the child is an aggravating factor because they

16   tricked her, he says.

17         But we would submit that not involving their child

18   showed -- is a mitigating factor.

19         Third, I would point out to the Court that there is no

20   affirmative act of deception that was involved here.  Yes,

21   the Abbotts agreed to participate in a deceptive scheme, and

22   they are owing that; and when Mr. Abbott speaks, I'm sure he

23   will speak directly to that.  But there was no

24   photoshopping.  There was no affirmative acts that they took

25   that specifically deceived anyone.

1          I would point out specifically for Mr. Abbott, his

2     involvement in this case, his actions that he took,

3     consisted of sending two wire transfers.

4          THE COURT:  Well, you can't -- I agree that there

5     was -- I think we called it in some of the other cases a

6     level of active participation, that you don't have that

7     additional active participation here.  But to suggest that

8     there was no act of deception...  The whole point is there

9     was an act of deception.  That's why we're here.

10         MR. STEIN:  I take the point, your Honor, and I

11    don't mean to deny that they -- as I said, that they

12    participated in a deceptive scheme.  My point is only to

13    emphasize that there aren't the additional acts that your

14    Honor pointed to in other cases.

15         The next factor I would point to relates to how this

16    offense came about in the Abbotts lives.

17         I think my colleague, Mr. Devlin-Brown, will speak to

18    this as well, but we would submit to the Court that the

19    record here shows that this was not done out of a desire for

20    self-aggrandizement or to be able to boast about where their

21    children -- you know, what fancy schools their children had

22    gone to.  The Abbotts, it's worth -- it's important to

23    consider, did not pursue anything like this for their two

24    older children.  They allowed those children to pursue their

25    own paths based on their own skills and their own interests

1    and what made sense for them.

2         In this case, they sought a college counselor not

3    because they were looking for some unfair advantage in

4    trying to get that daughter into the school or to get the

5    thing that they paid for, as Mr. Rosen says, but because

6    their daughter was genuinely and severely ill.

7         We presented to the Court documents relating to her

8    Lyme disease.  Mrs. Abbott will speak about and has

9    submitted a letter addressing the trauma that her daughter

10   was going through.  Her daughter had to leave school -- or

11   their daughter had to leave school because she couldn't

12   continue to attend classes, given her illness.

13        And in that circumstance, because they were

14   home-schooling her, they sought a college counselor that

15   would provide similar services to what a college counselor

16   at a traditional school would do.  That college counselor

17   that they were introduced to was Rick Singer, and that led

18   them down a path where they made a terrible decision, which

19   again, they own.

20        But it's not as if this was a student who was going

21   along in school and testing a certain way and the parents

22   said, Well, no, I want my kid to go to this school rather

23   than that school, so I'm going to seek someone who can get

24   me an unfair advantage.  And I think that's an important

25   circumstance for the Court to weigh as well in evaluating

1   this case.

2        Now, the two factors the government emphasized are

3   the amount of money that was paid and the number of times

4   this was done.  And I think they misinterpret these factors.

5        With respect to the amount of money that was paid, it's

6   hard to see from where we stand why that says anything about

7   their culpability.  Mr. and Mrs. Abbott had no role in

8   setting the price that Rick Singer quoted them.

9        As I will address in a moment, Rick Singer, as we

10  specified in our memorandum, Rick Singer came along at a

11  time of extreme distress in this family's lives.  We think

12  he was aware that they had a foundation and set his price

13  based on what he thought was available in that foundation.

14       But they didn't say, Well, we'll pay more to get a

15  higher score or, We'll pay more to get special treatment.

16  They were quoted a price and they paid it.  And we submit

17  that that doesn't in any way reflect more culpability on

18  their part than others.

19       With respect to the number of times this was done, I

20  think the government is splitting hairs.  This was one

21  course of conduct over the course of four months for a

22  daughter who, unlike some other students, had decided to

23  take two tests.  She was taking ACT and the SAT subject

24  tests, and so they made the same bad decision with respect

25  to both.

1          THE COURT:  But isn't it -- for purposes of

2     sentencing, how is that any different from any time somebody

3     in the course of, you know, if I'm sentencing someone who's

4     dealing drugs or robbing banks or anything?  The fact that

5     people engage in it more than once, why isn't that a

6     relevant thing to consider?

7          MR. STEIN:  It's a relevant thing to consider.

8     What I'm trying to respond to is I think the government

9     is overstating its significance.  And what I'm trying to

10    distinguish is a circumstance where someone sells drugs,

11    stops, and then, after a longer period of time, decides to

12    re-engage in the same conduct again; as opposed to someone

13    who might say, "I'm going to sell drugs to you on Monday and

14    then again or Friday," and then they do it on Monday and on

15    Friday.

16    I'm not saying it's irrelevant, but I think what

17    happened here was not a completed offense and then a

18    separate decision to engage in the same offense again.  It

19    was a single course of conduct that occurred over a

20    relatively compressed period of time.

21    I want to turn to address a little bit more and give a

22    little further context to what was going on specifically in

23    Mr. Abbott's world at the time Rick Singer appeared.  And we

24    mentioned this in our sentencing memorandum, which I know

25    the Court has read, and I don't want to belabor the point,

1    but I think it's worth pausing on for a moment, especially

2    in light of the government's presentation.

3        At the very time Rick Singer entered Mr. Abbott's life,

4    he had just separated from his wife of 31 years, and they

5    were barely speaking to each other.  His daughter had moved

6    to Colorado with Mrs. Abbott, and Mr. Abbott was not

7    speaking at all to his daughter at the time.  He said in his

8    letter that the only connection he had to her at the time

9    was through Rick Singer.

10       Their son's addiction was at the time spiraling out of

11   control.

12       Their daughter was suffering from a serious and

13   debilitating and, in some ways, mysterious illness that was

14   a cause of great stress in the marriage and in their lives.

15       Mr. Abbott's closest friend had passed away within a

16   few months before.

17       And so I want the Court to consider Gregory Abbott

18   alone, without his wife, without his best friend, limited

19   relationship with his daughter, 68 years old.  While he's

20   quite wealthy, and they understand they're quite privileged

21   and appreciate that, their finances were also a concern for

22   them.  Their wealth is largely in real estate and other

23   illiquid assets.  Mr. Abbott had not had a steady income in

24   many, many years.  And, as the Court sees in the presentence

25   report, their monthly expenses greatly exceeded their

1    income, and their expenses that they were anticipating for

2    their son's addiction and their daughter's illness were

3    daunting.

4        Again, we understand they are still quite wealthy, and

5    I am not asking the Court to see that any differently.

6        But I think, based on my many discussions with Greg, I

7    understand that he was in a place where he felt that he had

8    let everybody down.  The people who he loved the most were

9    hurting, and he wasn't able to help them.  And along comes

10   Rick Singer, who is offering some degree of normalcy for

11   their very ill daughter at a time that for Greg was a time

12   of true desperation.

13       Now, of course, Greg should have decided not to go

14   along with Singer's scheme.  We have suggested in our memo,

15   and I believe, had Mrs. and Mrs. Abbott been speaking to

16   each other, if he had the counsel of his friend, perhaps he

17   would have made a different choice.

18       But I think, and I base this on my many discussions

19   with him, that in that moment, recognizing now in hindsight

20   as he certainly does that he had a choice, he simply felt as

21   if he was trapped, and if he were to say no to this, if you

22   were to say, No, I'm not going to spend the money out of the

23   foundation to pay for Rick Singer's services, that might

24   cause a permeant break in his relationship with his

25   daughter.

1       He understands he's wrong about that.  That was not the

2  right way to think about it, and his daughter certainly

3  would not have held that against him, but that's what he was

4  thinking at the time.

5       And I say all this, your Honor, not to excuse his

6  behavior -- and again on his behalf we express great remorse

7  and regret about that choice that was made -- but I say it

8  because I think it does bear on the Court's consideration of

9  the nature and circumstances of this offense.  And this

10  offense was born not out of greed or narcissism or a sense

11  of entitlement, but was truly born out of a sense of

12  desperation from a family that was rapidly spinning out of

13  control.

14       And I think that goes to considerations about

15  deterrence, both specific deterrence, because Mr. Abbott is

16  taking steps to address many of these issues, and I think it

17  bears as well on general deterrence.

18       I want to say a couple of more words about the

19  sentencing factors, and then I'll yield to Arlo.

20       With respect to general deterrence, you know, I know

21  that's a factor that's weighed heavily in the Court's

22  consideration in other cases, and I don't disagree with

23  anything that the Court has said about that.

24       I would like to make one further observation for the

25  Court to consider, which is that, you know, obviously it's

important to deter people from committing crimes.  I would say in a circumstance like this, which is, you know, the circumstances were so extreme, it weighs less.

But I think there's also value in a legal system that people see as one where if you admit your crimes, you plead guilty, you take responsibility, it doesn't necessarily lead to the jailhouse; that there's also opportunities for mercy and for redemption.  And I know that the statute requires the Court to consider promoting respect for the law, and I would humbly submit it would promote respect for the law to show mercy in this case.

Now, the defendant's, Mr. Abbott's, history and characteristics are also worthy of leniency.  We submitted many letters attesting to his life of good deeds, the work he's done for a bottling company to try to provide safe drinking beverages for people in other parts of the world.  He paid for surgery for a friend who wasn't able to afford it.  He championed the cause of the victims of a Ponzi scheme, including raising funds for one who was a quadriplegic.

In reviewing the letters submitted on Mr. Abbott's behalf, I was struck by how many of them spoke of the same traits, and these were letters written by people from all different walks of life, who spoke of his big heart, his trusting nature, his loyalty, honesty, and generosity of

1    spirit.  One friend wrote that he trusts Mr. Abbott with his

2    life.

3         Finally, in thinking about disparity, we need to avoid

4    unwarranted disparity.  I would ask the Court to think

5    beyond the defendants in this case and think about disparity

6    with all other defendants sentenced in federal court who are

7    first-time offenders, who are guilty of non-violent

8    offenses, who have a zero-to-six Sentencing Guidelines

9    range.  And of the thousands of defendants sentenced in

10   federal court this year under those circumstances, I would

11   submit that this is not the one, this 69-year-old man is not

12   one of the few, that needs a sentence of imprisonment.

13        And so for those reasons, we would recommend a sentence

14   of probation, to be followed -- or to include a substantial

15   period of community service and a substantial fine.

16        THE COURT:  Did you want to -- I posed the question

17   to Mr. Rosen, and so I pose it to you as well.

18        With regard to how and where I have been sentencing the

19   other defendants, recognizing that, just as much as

20   Mr. Rosen doesn't appreciate what I've been doing, I don't

21   think the defense bar has either, but looking at the

22   defendants before me.

23        MR. STEIN:  I would say, your Honor -- and, of

24   course, it's a difficult position because I know this case

25   so much better than the others.  But when I look at the

1   factors, I, frankly, see them as among the least culpable of

2   defendants.

3       I don't see the, sort of, extra acts of deception we

4   talked about, you know, photoshopping.  I don't see them

5   engaged in the college recruitment scheme.  I don't see them

6   trying to press their advantage.

7       I think, frankly, the circumstances that existed in

8   their lives at the time this came along really

9   differentiates this case from the others.  And I say that

10  with some trepidation because I don't know the facts of all

11  the other cases as well.  But I think that's an adequate

12  basis for the Court to conclude that a lower sentence is

13  warranted in this case.

14          THE COURT:  Okay.  Thank you.

15          MR. DEVLIN-BROWN:  Thank you, your Honor.

16      I want to start with something that the government has

17  said, both in a filing and I believe in a few sentencings,

18  and it's true.  They've said that, Prison is the great

19  equalizer.  Everyone behind bars, rich or poor alike,

20  suffers in the same way.

21      Sickness and addiction are also great equalizers.  And

22  I don't mean that in a callous sense.  Of course people with

23  money can get better healthcare.  But money doesn't shield a

24  mother who's finding clumps of her daughter's hair in the

25  bathroom because her autoimmune system is attacking itself.

1          It doesn't help when a boy that you raised and loved

2     causes you to fear for your safety at times and you go on

3     these up-and-down roller coasters of relapse and sobriety.

4          Those are the kinds of things, your Honor, that, no

5     matter how wealthy a family, can break a family.  They can

6     have an insidious, damaging effect, and they did on the

7     Abbotts.  It split apart a 31-year marriage, and it divided

8     the family literally, with Marcia in Colorado with her

9     daughter and Greg with his son in New York.

10          Those were the circumstances both Greg Abbott, and I'm

11     going to speak of Marcia Abbott, found themselves in at the

12     time Rick Singer came into their lives.

13          And I'm -- the government is representing the

14     government, and there are many points they make, and I

15     understand them.  But some of the rhetoric I find really

16     beyond the pale.  Marcia Abbott was not in Colorado feeling

17     a, quote, "air of invincibility," quote, "looking to...,"

18     quote, "...crush the competition."  She was trying to

19     home-school her daughter with the assistance of an online

20     program, while traveling all over the place trying to get

21     someone, anyone -- hopefully your Honor's read the letter

22     from her health advocate -- who could find out what was

23     really going on with her daughter and fix it.

24          The same thing with the government's sentencing

25     brief -- which, of course, they read the same PSR -- the

1  Abbotts were accused of exploiting their daughter's Lyme

2  disease.  This is a girl who dropped out of school, where

3  she would have been doing very well, and was now being

4  home-schooled by her mother with the assistance of an online

5  program.

6      Your Honor, you know, some of the material -- the

7  family's comfortable talking about, as is the daughter, Lyme

8  disease because it's an unrecognized, for a lot of people,

9  disease, and the serious effects it can have.  We've seen it

10  in some of the materials.  Her Lyme disease doctor found her

11  situation very serious and made a recommendation about extra

12  time before Rick Singer ever entered their lives.

13      So, Marcia Abbott was focusing mostly on her daughter's

14  medical care, trying to give her home-schooling.  Her

15  daughter was committed to wanting to go to college.  And

16  Marcia Abbott wasn't, nor Greg Abbott, gunning on Duke.  And

17  I find -- again, this is a little distressing, that the

18  government seems to be trying to convert this case into one

19  where there was some particular school and some identifiable

20  student that was going to be harmed.

21      This is a very damaging scheme, don't get me wrong, but

22  Xxxxxx applied to -- excuse me.  Her daughter applied to

23  many colleges, I think over a dozen colleges.  She applied

24  early for many colleges.  There is nothing in the record

25  that supports the government's rhetoric that it was all

1    about Duke, high or low.

2        Their daughter was committed to trying to live as

3    normally as possible and apply to college and see where it

4    took her.  And her parents wanted to support that.

5        And I think that's important when you talk about how

6    they met then Mr. Singer.  Because they didn't, unlike some

7    parents, seek out someone for corrupt purposes.  They needed

8    a guidance counselor.  She was home-schooled.  And this

9    guidance counselor found Mr. Singer, claimed -- we still

10   don't know the degree it's true -- but claimed to be

11   affiliated with Laurel Springs, which was the online school

12   providing the course work.

13       When he said to the Abbotts, I work with sick children,

14   I have testing centers that can accommodate them, that's not

15   the red flag it is for other parents who don't actually have

16   a sick child who is clearly going to be entitled to extra

17   time anyway.

18       Now, that doesn't excuse what they did.  And they've

19   acknowledged, and we have, your Honor, at some point it

20   became clear that Mr. Singer was going to do something to

21   cheat, and they went along with it anyway, and that's

22   unacceptable.  But the circumstances that they got involved

23   in and how they found Mr. Singer are very, very different.

24       You know, the other point I want to make in response to

25   something the government said is -- they come back to the

1     calls, and they say, you know, what they say on the calls

2     says everything.

3          And, you know, we had a general dispute about that in

4     the probation report.  We asked the probation officer to

5     note that she did -- that the government's sentence or two

6     leading up to a call transcript often was not supported by

7     what was actually in the call transcript.  And it seems fair

8     to ask the government that if they're going to use people's

9     words against them on the call, they at least get them

10    right.  And there's a very disturbing instance in this case

11    where the government didn't do that, your Honor.

12         If you have the PSRs, for Marcia Abbott on page 54 of

13    the final PSR, there was a call quoted.  It's Objection 2 at

14    the top of page 54.  The transcript that the government had

15    provided or used in its complaint and other documents has

16    Marcia Abbott saying, "All right.  See loves the guy who

17    took her SATs."

18         When we heard that, a couple of things seemed wrong.

19    One is, The guy who took something, it would have been the

20    ACTs, not the SATs, but "took" wasn't even consistent with

21    the government's theory.  The government's theory and what

22    happened is the proctor after the fact corrected the

23    answers.

24         So we went and we listened to that call, and she does

25    not say "took."  She does not say "took the SATs."

1    You can't tell exactly what she said.  It could have

2    been "proctor."  It could have been "the guy who was there,"

3    but she doesn't say "took."

4    And the government agreed to that, and they agreed that

5    the PSR should be changed.  But then when they filed the

6    sentencing submission to your Honor, they put "took" right

7    back in there, even though they had agreed the language was

8    wrong in the PSR.

9    And I don't think that's bad faith at all, your Honor.

10   I don't think so.  But I think it's the government hearing

11   what they want to hear and interpreting the calls the way

12   they want to interpret them.

13   And again, it doesn't excuse the Abbotts, but they did

14   not have conversations along the lines of, I don't have any

15   concern about morality.  They did not have conversations

16   like that at all.  They're muddy, messy conversations where

17   they clearly know at some point that Mr. Singer is going to

18   be doing something improper, but they're not the

19   conversations that are described.

20   I'd also like to address the claim by the government

21   that Marcia Abbott was going to, quote, "Sue the College

22   Board."

23   And again I think this is an effort to make the Abbotts

24   fit into one of these other categories where the Court in

25   the past, or certainly the government in the past, has found

1    an aggravating factor.  And, of course, there was a

2    defendant who your Honor sentenced who decided to bring a

3    lawsuit against the university where his child was admitted

4    after pleading guilty.  There was another defendant your

5    Honor sentenced, I believe last week, who, on his own,

6    engaged a lawyer with a plan to sue.  I don't remember if it

7    was the College Board or the ACT service.

8        The government is trying to lump Marcia Abbott into

9    that, and we asked them in the sentencing process, What's

10   the basis for that?  And they pointed to, and it's now in,

11   their sentencing submission, a call note, a call log, from

12   the College Board which they quote, and it says that -- I

13   would like to quote it exactly, if you don't mind, your

14   Honor.

15       It's on page 4 at the bottom.  The call log reads,

16   "They, filing a Legal Complaint," with "L" and "C"

17   capitalized.

18       Now, we don't deny that that's in the college call

19   center log.  I don't know how much credit you give for

20   everything being 100 percent accurate there.

21       There was another call, for example, that the

22   government cited where Marcia Abbott supposedly asked for an

23   exception so her daughter didn't have to take it in her home

24   high school, never mind that she was being home-schooled and

25   did not have a home high school.

1          We're not denying that this was said, but Marcia Abbott

2     does not believe she said she was going to bring a lawsuit

3     on this occasion or, frankly, at any point in her life.

4          So could the call center person have -- she probably

5     did say something about, you know, what her legal rights

6     what her legal options.  That might have been put in there

7     to elevate this to -- so someone would pay attention to it.

8          It's not ultimately an issue to govern the sentence,

9     but I think it's an illustration of the government trying to

10    take something where the evidence really isn't there and

11    convert it into a case that sounds much more serious.

12         One other point just on this call log, because

13    Mr. Rosen stood before you and said, "And she lied about her

14    scholarship."  That was just completely incorrect.  This

15    call logs says, "The student has a chance to be offered a

16    scholarship award but she must apply early and the score is

17    only missing on that application.  She's a Soloist in

18    Metropolitan Opera in New York City."

19         It doesn't say she's been offered a scholarship.  There

20    is no lie there.

21         I want to respond to something that my colleague,

22    Mr. Stein, already addressed with your Honor to your Honor's

23    question of, Well, they did do this more than once.

24         And, look, it's a point -- it's a fair point, of

25    course, for the Court to consider.  But there's not any

1    other parent that I'm aware of in this charged scheme who

2    did it with one test for their child but then pulled out

3    before they did it for another test.

4        There is a parent, your Honor sentenced her first, who

5    decided not to do it with a second child.  I submit there's

6    no indication the Abbotts would ever do this with another

7    child either.  As your Honor saw in our submission, with

8    their prior two children, the Abbotts were not obsessed with

9    obtaining the top college.

10       THE COURT:  Maybe I didn't follow your point there.

11       When you say there isn't another parent who didn't

12   pull -- who pulled out before -- I'm not following what

13   you're a saying there.

14       MR. DEVLIN-BROWN:  So, as Mr. Stein mentioned to

15   the Court, their daughter happened to be taking both the

16   ACTs and SAT subject matter tests.  Not every child takes

17   both of those things.  And so they had Mr. Singer use his

18   improper, illegal services and improperly benefit their

19   daughter on both of the tests she took.

20       But I don't believe there is any case before the Court,

21   and Mr. Rosen can correct me if I'm wrong, but I don't

22   believe there is any case before the Court where there was a

23   child who was taking multiple tests in the same college

24   admissions process and used Mr. Singer for the first but

25   then got qualms before using him for the second.

1     There are people who decided not to do that for another

2     child.

3           THE COURT:  Mr. Sloane didn't do the second test, I

4     believe, or Mr. Huneeus.  It was one of the two of them.

5        Mr. Herneeus --

6           MR. ROSEN:  Mr. Herneeus.

7           THE COURT:  -- did not do a second test.  He moved

8     on to the college scheme.

9           MR. DEVLIN-BROWN:  Yes, I'll -- I'll take that as

10    an answer, your Honor.

11          So, I want to end, or come towards the ending, with

12    what I started with, your Honor.

13         This was a family that was under extraordinary

14    pressure, extraordinary pressure from addiction, from

15    sickness, from splitting up.  These are the kinds of things

16    that can devastate any family, and it can weaken the fiber

17    of your otherwise strong moral fences.

18         Now, I don't want to go too far with that, your Honor.

19    It's not an excuse.  There are mothers who, in Marcia

20    Abbott's situation, would not have done what she did.

21         But I think the corollary to that is also true, that

22    Marcia Abbott would not, in her wildest dreams, have done

23    anything like this had it not been these extraordinary

24    circumstances.

25          They didn't do anything remotely like this for their

other two children.  They accepted that one of them wanted
to leave college early to pursue an entrepreneurial career.

They accepted that their other child, who your Honor
has a great deal about in the record, was probably not going
to agree well with college and it wasn't for him.

It's impossible to imagine this except for this perfect
storm of what occurred.

Why does that matter?

I submit it matters here, your Honor, just as it does
probably for almost every sentence your Honor has to impose,
whether it's wondering whether the person who was convicted
or pled guilty to a food stamp fraud did so misguidedly but
to feed their family, or was selling the food stamps.

There is always a question with any defendant as to how
did that person get to that dark place where they did this
thing.  And it's relevant to individual deterrence.  It's
relevant not to whether there's moral culpability, but the
degree of moral culpability.  And I think it's also
relevant, your Honor, to mercy, and what mercy should be
afforded to someone in such a situation.

General deterrence is important.  Your Honor's said
that at many sentencings.  And your Honor also knows, of
course, it's not the only factor.  It can't be a case that
any parent convicted of this scheme, no matter what, has to
go to prison for general deterrence when the other

1    sentencing factors may not support it.  And your Honor to

2    date has sentenced people to a wide range, as low as two

3    weeks and high as -- four months, was it?

4            THE COURT:  Five.

5            MR. DEVLIN-BROWN:  And in this case, your Honor, we

6    submit that if you consider all of the sentencing factors,

7    this is not a case where prison should override those

8    sentencing factors.  This is not a crime that was driven by

9    narcissism, or privilege, or desire to brag.  It was born of

10   sickness and addiction and the despair a mother, like Marcia

11   Abbott, can face when going through such a situation, and I

12   submit that counsels for a sentence with no incarceration

13   here, your Honor.

14           THE COURT:  Thank you.

15       So I haven't normally done this with two defendants

16   being sentenced at the same time, but this has been how we

17   are proceeding.  I believe that was the defendants' choice

18   here.  But if either or both of you would like to speak

19   before I sentence you, go ahead.

20       (Pause in proceedings.)

21           DEFENDANT GREGORY ABBOTT:  Your Honor, I grew up to

22   romanticize the American dream, where anyone, regardless of

23   background, can carve out a good life by virtue of honest

24   hard work.

25       My parents, children of immigrants, grew up during the

1    Great -- excuse me.  I'm doing my best -- Great Depression

2    and couldn't afford college.  But they were smart and worked

3    themselves to the bone to make a better life for themselves

4    and their family.

5        I was the first in my family to go to college.  My

6    parents taught me the virtues of hard work, sacrifice, and

7    earning one's way; honoring a handshake, even when it works

8    to your detriment; taking away something positive from both

9    victory and defeated; to treat everyone with respect and

10   humility, whether king or pauper; to strive mightily, but

11   never put money or success on a pedestal, as they are hollow

12   without personal integrity.

13       These are values I have tried to live by and instill in

14   my three children, values which, in this tragic instance, I

15   failed to uphold.

16       I grew up to feel natural empathy for others and know

17   what it's like to struggle and to suffer.  Like many

18   parents, I'm guilty of trying to spare my children pain,

19   even while knowing that my most valuable life lessons have

20   come from looking pain in the face.

21       Our daughter has looked pain in the face.

22       (Pause in proceedings.)

23       DEFENDANT GREGORY ABBOTT:  As you know, your Honor,

24   she was and is suffering from chronic Lyme disease, as well

25   as the trauma of having her parents and family in turmoil.

Through physical and emotional adversity, she earned As in her courses and was soloist at the Metropolitan Opera, while suffering with headaches, fevers, dizziness, joint pain, fatigue, brain fog, rashes, loss of hair, loss of stamina, loss of memory, that comes from Lyme disease.

Culpable and contrite as I am, I can state without reservation that I was not propping up an undeserving student for my own narcissistic ambition, but trying to help my earnest, talented, yet sick, daughter, who, in the realm of testing, had the deck stacked against her.

I offer this not as an excuse, but as an explanation for my serious ethical breach.

To understand my terrible mistake, one needs to know my wonderful daughter.  She is as authentic as they come.  She worked as hard as anyone, performing in over 30 opera productions, singing in six different languages, earning excellent grade, while under the debilitating yoke of Lyme. Despite her pain, she resolutely worked through her illness day after day, all but forsaking any social life for the sake of her goals and because she had neither the time nor energy for play.

Because of unsustainable school absences, she had to switch to the isolation of online schooling, which is when a well-meaning friend introduced us to Rick Singer for college counseling.  Had it not been for online schooling, our paths

1    never would have crossed.

2        Regretfully, had my wife and I been in better

3    communication and not 20 -- sorry, 2,000 miles apart, I am

4    certain this aberrational scenario never would have

5    unfolded.

6        Once Singer reviewed -- sorry.

7        Once Singer revealed his true nature, we should have

8    walked away.  Unfortunately, our marriage was dysfunctional

9    to the point of paralysis.  Shame on us for not rising above

10   it for the sake of the daughter we both believe in and adore

11   and for the sake of our own character and integrity that had

12   brought us together in the first place in wedlock.

13       I will never get over the anguish of knowing that I

14   hurt my own innocent daughter.

15       That is not to say that my daughter is the only victim.

16   I can imagine the affront to every teenager who worked hard

17   and made sacrifices to achieve his or her college dream, and

18   their parents, who raised them to play by the rules and

19   didn't have the means to game the system in the myriad of

20   ways it's done.

21       Believe me, your Honor, I have seen it all in

22   Manhattan, from nursery school to college.  I myself have

23   been offended by the sense of entitlement and the dizzying

24   lengths parents go to promote their agendas for their

25   children, concoct resumes, buy board seats, and pony up to

schools that marginalize those families who can barely afford to pay their tuition.

I've always tried to keep my distance from the culture of strung-out parents and stressed-out kids.  I share the same sensibilities as most people, your Honor, and, strange as it may sound, identify with the public outrage over my own actions.

It took the travails of having an addicted teen, a marriage in dire crisis after 31 years, an estranged daughter afflicted by Lyme disease, and acute business pressures for me to acted desperately, simply to bring a modicum of relief to our existence.

Throughout my life, I have shown integrity and have taken the right path under pressures, some of them great, but in this perfect storm I buckled, and I accept full responsibility.

To every single soul demoralized or offended by my actions, I deeply apologize for betraying the American dream I so revered and violating our sense of shared values.

While I truly believed Rick Singer, that I was being generous and helping disadvantaged kids by having my foundation donate to his IRS-sanctioned foundation, I also knew that my daughter would be getting some kind of help that was outside the rules.  I didn't know exactly how, and, frankly, I didn't want to know.

1      Yes, I was under pressure, yet there are millions of

2  people with pressures who still play by the rules.

3      To all those souls who struggle every day to put food

4  on the table and to get their kids mere access to college, I

5  apologize for any sense of resentment or inequity my actions

6  provoked and humbly ask forgiveness.  I want them to know

7  that I am not, nor ever have been, a schemer, but was acting

8  out of love for my sick daughter.

9      Still, it was wrong, stupid, and I feel genuine

10  remorse; not because I was caught, but because taking the

11  shortcut diminished me in my own eyes and hurt my daughter.

12      I cannot imagine myself ever again forsaking my moral

13  compass that otherwise has served me well for 69 years.

14      Your Honor, many dear friends have tried to console me

15  that the system is terribly flawed and that I, in my

16  particular situation, did what many parents would have done

17  to help their child.

18      My response to them has been unwavering:  A parent's

19  first duty is to teach his child right from wrong, and in

20  this case I set a miserable example.

21      Our daughter has held this ordeal with an inspiring

22  grace.  She is a beacon of innocence and virtue in this

23  debacle who deserves empathy, admiration, and respect.

24      Though not proud of my own actions, I am incredibly

25  proud of her and believe more than ever in the aphorism

1    that, "We have as much to learn from our children as they

2    from us."

3            (Pause in proceedings.)

4            DEFENDANT GREGORY ABBOTT:  She has forgiven us.

5    She is uniting us.  Our family is healing.

6        Your Honor, all I ask is that you see me, and

7    especially my family, as the decent human beings we are,

8    rather than the media stereotypes we are not, and know that

9    I'm truly sorry on every conceivable level.

10       Thank you.

11           THE COURT:  Thank you.

12           DEFENDANT MARCIA ABBOTT:  Shall I read from here

13   or from the podium?

14           THE COURT:  Whichever you're more comfortable with.

15           DEFENDANT MARCIA ABBOTT:  Okay.

16       I appreciate, your Honor, this opportunity to express

17   my remorse.  I apologize to all who have been hurt or in any

18   way affected by my poor decisions.

19       I care deeply and empathize with struggles of all human

20   beings, and know what a long and challenging road it is to

21   achieve higher education in this country.  I have the utmost

22   regard for everyone who travels that road, along with the

23   effort and sacrifices it takes to get there.

24       My interaction with Rick Singer compromised the

25   integrity of that journey, and for that I am very sorry.

1        I apologize to my community, and to my larger

2   community, those unknown to me who have been impacted by

3   this case.

4        Despite having three children, this was our first time

5   reaching out to a professional college adviser, as my

6   daughter was suffering from late-stage Lyme disease,

7   necessitating her to be online schooled at home.  She has

8   earned every step of her way in life, so it came as no

9   surprise that, despite chronic illness, she was determined

10  to apply to college.

11       When I was introduced to Rick Singer, his seeming

12  empathy for a sick child, along with the fact that he had a

13  charity, gave no warning that anything was amiss.

14       We latched on to what we thought was a positive

15  resource, but it turned out to be a corrupt lifeline.  I

16  kept viewing Mr. Singer as a valid professional, long after

17  I should have.  Ultimately, I have only myself to blame.

18       Please know that the crime for which we are here today

19  is not indicative of who we are as a family.  I've always

20  regarded the law with unquestioning respect, and have

21  impressed these values upon my children.

22       I do not look at colleges as status symbols, and have

23  always been far more interested in raising good citizens and

24  humanitarians.  I've never been overly involved with my

25  daughter's academics or extracurriculars, as I never had to

be.  Lyme disease and home-schooling changed this, as both

her energy and cognitive functioning became unpredictable.

When my daughter's health went down and our family

split up, I was not only heartbroken, but broken, as my

family is my life.

(Pause in proceedings.)

DEFENDANT MARCIA ABBOTT:  I have spent many months

not only regretting but analyzing my actions, because it is

not enough to say, "I was in error."  I have reached out to

professionals and parsed through as much as I can remember

in order to avoid any future similar mistake.  I've never

knowingly been around criminals, nor have I even imagined

breaking the law, yet neither of these things protected me.

My husband and I were both motivated by good intentions

and concern for our daughter, but this does not excuse our

choices.

I've always known that acting out of fear or anxiety

leads to negative results, yet unquestioningly acting out of

strong maternal love can equally lead one down the wrong

path, especially with judgment clouded by fracture and

illness.

I've examined my weaknesses under a harsh microscope.

I ask the forgiveness of all who were hurt by my

mistakes.

Throughout my life I have witnessed people leapfrogged

1   over because of connections, gender, money or politics.  I

2   promise you, that was never our aim when we reached out to a

3   college adviser.

4        Finally, I ask forgiveness of my daughter for my

5   wrong-headed choices made at an extremely vulnerable time.

6   Everyone who knows her has always had faith in her

7   intelligence and work ethic, but no one could rely on the

8   unpredictability of her illness.  She worked through a fog

9   of sickness, maintaining a high GPA and, when rested, scored

10  well on tests and practice tests.

11       My interaction with Rick not only diminished her

12  achievements, but her valor in persisting through adversity.

13  I will always regret that deeply.  We are all so much more

14  than the sum of our tests.

15       Your Honor, I stand before you today extremely contrite

16  and remorseful.  Each day I regret my mistakes, yet I remain

17  committed to a giving life, to do all I can for my

18  daughter's recovery, my family's unity, and to continue to

19  contribute to my community and to the world at large.

20       Thank you.

21            THE COURT:  Thank you.

22       (Pause in proceedings.)

23            THE COURT:  As many of you in the courtroom who

24  have been through quite a number of these proceedings

25  understand, what I must do here is consider, under 18 U.S.C.

1    Section 3553(a), a number of factors and a number of

2    policies.

3        Factors being:  The nature and circumstances of the

4    offense; each defendants' personal and criminal history and

5    characteristics; kinds of sentences available, kinds of

6    sentence on sentencing range established for the category of

7    offense; a need to avoid unwarranted sentencing disparities.

8    And with regard to the purposes of sentencing:  Imposing a

9    sentence that is sufficient, but not greater than necessary,

10   to comply with these different requirements; that the

11   sentence reflect the seriousness of the offense; promote

12   respect for law; provide just punishment for the offense;

13   afford adequate deterrence; protect the public; and provide

14   the defendant with correctional treatment in the most

15   effective way.

16       A sentencing is a very difficult thing because there

17   are those different factors, different policies.  There's

18   the individual people in front of me.  There's the larger

19   societal concern.  It a somber time always for me and a

20   difficult set of decisions.

21       And I join the defendants in some concern about almost

22   a sense of glee in some of the quotes and statements in the

23   government's memorandum, because this isn't a time of glee

24   or "Got you."  These are sad events when we're doing

25   sentencing, and I am faced with figuring out what to do in

1   circumstances where people are people and may well be very,

2   very decent people, but people who've committed a crime.

3         I want to go back and just talk briefly about my

4   determination to throw out the government's argument on how

5   to calculate the guideline sentence.  "Throw out" may be a

6   little strong of a word.  Why I analyzed it differently than

7   the government did.

8         We all agree that the sentence -- that the offense

9   here, which is a felony, has a statutory maximum of 20

10  years.  It is a serious felony.  And it starts with a base

11  offense level of 7, and that is the starting point that I

12  think everyone here agrees with.

13        Mr. Abbott noted in his letter that was filed that he

14  didn't understand he was committing a felony, and I think

15  that may well have been the case with a lot of the

16  defendants here.

17        Ignorance of the law isn't a defense.

18        One could debate how this crime was charged, but it is

19  a prosecutorial decision, and the crimes that were charged

20  are serious felonies, and those are the serious felonies to

21  which you have pled guilty.

22        So that is my starting point, a base offense level of 7

23  under the Guidelines and a serious federal felony as far as

24  the statutory framework.

25        And I note that there are other defendants who are

1    still proceeding here in other proceedings who are

2    challenging that legal framework and that these defendants

3    here in front of me, all of the parents in front of me, have

4    accepted the way this has been framed and have pled guilty

5    to a felony.

6        The second piece of it, the place where I diverge from

7    the government, is how to consider the crime and whether

8    there were factors which the Sentencing Guidelines would

9    direct me to consider as an aggravating matter.  And the

10   Guidelines use this concept of a gain or a loss, and the

11   government suggested that that followed and tracked what the

12   United States Sentencing Commission had promulgated.

13       And I disagreed with that.  I don't find that the

14   dollars that were paid represented any intended loss or any

15   gain that could be obtained from the victims.  And so I made

16   the determination, and that is spelled out in my order, that

17   the Guideline way of measuring this did not include the

18   calculation that the government was putting out, which

19   brings us to a zero-to-six-month sentence under the

20   Guidelines.

21       I then have defense counsel coming in and saying, Well,

22   statistically someone who has a zero-to-sixth-month

23   guideline with no prior record -- well, they probably have

24   no prior record, which is why they have the zero to six --

25   but that person typically will not, in the vast majority of

1    cases, will not get prison time.

2        But I'm still looking at the fact that this was a

3    substantial monetary commitment, that there was a large

4    effort here to make this crime happen.  And so I don't just

5    take that money off the table and say, The Guidelines don't

6    apply, and then say, Now, I start at the beginning at a zero

7    to six.  Technically, I'm at a zero to six, but that doesn't

8    mean that you, therefore, go for the lightest possible

9    sentence of a zero to six.

10       So I think, being steadfast in how I am applying the

11   Guidelines, and I'm moving from there, is that the

12   government's calculation, in my view, is incorrect, but that

13   does not mean that this is a very small offense.

14       So that's where we start, and I then need to figure

15   out, What do I do with all of that?

16       A second sentence that I found in your letter,

17   Mr. Abbott, and that you repeated here, Many parents would

18   have done this to help a child, and that's what your friends

19   are saying, and that's what communities, people, are saying.

20   Well, maybe this isn't so bad.  People would do this.

21       And I recognize your acknowledgment now that you

22   wouldn't do this and that you realize that it was a mistake.

23       But that is the piece that I am struggling with on the

24   general deterrence front.  Is the notion that when you're

25   confronted with this option, the question isn't, Do I have

1     the money to pay for this?  The question is, Do I do this or

2     do I not do this, no matter how needy the circumstance.

3          I want to be very clear that I'm not faulting the

4     defendants here, or any of the other parents, for using

5     legitimate advantages that your money does allow you to get

6     to.  And, in particular, this issue of additional

7     test-taking time, there has -- and I said it before and I

8     will say it again here -- there has been no demonstration in

9     the cases in front of me that any of the children who got

10    additional test-taking time did not medically qualify for

11    the additional test-taking time that they sought.

12         It does raise a question about the fairness of these

13    exams, where, I think it was the Wall Street Journal, but

14    I'm not sure, but certainly where it has been reported that

15    in rich communities a very high percentage of our students

16    are getting additional time and in poor communities they're

17    not, suggesting not necessarily that this is a error of

18    privilege but perhaps that the idea of a timed test needs to

19    be reexamined if, perhaps, these types of advantages should

20    be given across the board.

21         But, at any rate, there is no penalty for that in any

22    of these cases that have been in front of me.

23         The problem is the steps taken after the tutoring, and

24    in this case there were two occasions, not one.  I do find

25    that a slightly worse circumstance than doing one.  I

1    understand the point that it's part of the same course of

2    conduct, but it is, as I look at the parents, a difference.

3         The dollar value that was charged for the different

4    tests, I do agree with defense counsel that the fact that

5    Mr. Singer charged different amounts doesn't really factor

6    in here all that much.

7         The government argues that the Abbotts eagerly

8    participated in this case, and again I don't find that.  I

9    don't see that's what's here.  I see that they actively --

10   that they, in fact, participated, that's why we have a

11   criminal offense, but I don't see any eager participation.

12        I don't have the direct involvement of the child, and

13   maybe I should elaborate a little bit why that is important

14   to me.

15        I'm not doing moral parenting here.  I'm not penalizing

16   people for tricking children or not tricking children.  The

17   issue when the child is knowingly involved is that the child

18   is being put in the way of a subject to federal felony

19   charge, and that's a danger, and that did not happen here.

20        So those are the various pieces with the nature of this

21   crime.

22        I do need to look at what is sufficient and not greater

23   than necessary, and I'm quite cognizant of the difficulties

24   that this family has been undertaking and having to deal

25   with, and I do take your point that addiction and illness

1    are matters that are making things much more difficult here

2    than in some cases.

3        All of that gets me to the point, which I am imposing

4    here, as I have in the previous cases, a sentence of

5    incarceration.  It serves as punishment in a somewhat

6    neutral way.  It serves as general deterrence, which seems

7    to be necessary.

8        That said, I don't see any reason to sentence these two

9    defendants at the level that the government is seeking, and

10   I will impose, instead, a one-month sentence on each of

11   them.

12       With regard to the -- and that serves, in my view, both

13   a punitive and a general deterrence.  I don't think it is

14   needed for specific deterrence, and I don't think it is

15   needed for rehabilitation.  But I am, nonetheless, imposing

16   it.

17       With regard to rehabilitation, I will impose a one-year

18   supervised release and 250 hours of community service.

19       The fine is an interesting issue here because basically

20   the defendants are charged as if they paid this twice.  It's

21   one family, as far as I can tell, and it's one set of

22   accounts.  But to take the money that was spent here as a

23   marker for potential fines twice, essentially, as there

24   being two defendants, doesn't seem to make that much sense.

25       Nonetheless, I'm imposing a higher fine than would come

1   under the Guidelines, which will be a $45,000 fine for each

2   defendant.

3       I intend to impose the conditions of supervised release

4   that are listed on your presentence report, a hundred-dollar

5   special assessment for each defendant, no restitution, no

6   forfeiture.

7       Any objections to the sentence not previously stated?

8           MR. ROSEN:  No, your Honor.

9           MR. STEIN:  No, your Honor.

10          MR. DEVLIN-BROWN:  No, your Honor.

11          THE COURT:  So I think I need to do this one

12  defendant at a time.  So, with the exception of the

13  supervised release conditions, I will read them only once

14  and then state them by reference the second time.

15      Mr. Abbott, if you will please stand.

16      Pursuant to the Sentencing Reform Act of 1984, and

17  having considered the sentencing factors enumerated at 18

18  U.S.C. Section 3553(a), it is the judgment of the Court that

19  the defendant, Gregory Abbott, is hereby committed to the

20  custody of the Bureau of Prisons to be imprisoned for a term

21  of one month.

22      Upon release from imprisonment the defendant shall be

23  placed on supervised release for a term of one year.

24      Within 72 hours of release from custody of the Bureau

25  of Prisons, the defendant shall report in person to the

1     district to which the defendant is released.

2         Restitution is not applicable here.

3         It is further ordered, Mr. Abbott, that you shall pay

4     to the United States a fine of $45,000.  This amount shall

5     be paid within 30 days of Judgment being entered, unless an

6     alternative payment schedule is requested by the defendant

7     and approved by me.

8         All fine payments shall be made to the Clerk of the

9     United States District Court, and you shall notify the

10    United States Attorney for the District within 30 days of

11    any change of mailing or residence address that occurs while

12    any portion of the fine remains unpaid.

13        While under the Probation Office's supervision, you

14    shall comply with the following terms and conditions:

15        You must not commit another federal, state, or local

16    crime.

17        You must not unlawfully possess a controlled substance.

18        Drug-testing conditions are suspended based on the

19    Court's determination that the defendant poses a low risk of

20    future substance abuse.

21        You must cooperate in the collection of DNA as directed

22    by the probation officer.

23        You shall comply with the standard conditions that have

24    been adopted by the court, which are set forth at Sentencing

25    Guideline Section 5D1.3(c), and will be set forth in detail

1    on the Judgment.

2         Special conditions:  You must pay the balance of the

3    fine imposed no later than 30 days unless I impose a

4    different schedule.

5         You are prohibited from incurring new credit charges or

6    opening additional lines of credit without the approval of

7    the Probation Office while any financial obligations remain

8    outstanding.

9         You must provide the Probation Office access to any

10   requested financial information, which may be shared with

11   the Financial Litigation Unit of the U.S. Attorney's Office,

12   while any financial obligations remain outstanding.

13        You must complete 250 hours of community service at an

14   agency -- and I'm anticipating here that you would -- an

15   agency that provides direct service to students or families,

16   and a special assessment of $100.

17        Did I miss anything?

18             PROBATION OFFICER:  No, your Honor.

19             THE COURT:  The sentence is imposed for all of the

20   reasons previously stated and because the Court believes the

21   sentence and all its components is reasonable and is a

22   sentence that is sufficient, but not greater than necessary,

23   to accomplish the goals of sentencing, consistent with 18

24   U.S.C, Section 3553 and the Supreme Court's guidance.

25        So, with that, I think I will have Ms. Abbott stand up,

1    and you may sit down again.

2         MR. STEIN:  We have some requests about

3    designation, but we can do that after.

4         THE COURT:  Okay.

5         Ms. Abbott, pursuant to the Sentencing Reform Act of

6    1984, and having considered the sentencing factors

7    enumerated at 18, U.S.C, Section 3553(a), it the judgment of

8    the Court that the defendant, Marcia Abbott, is hereby

9    committed to the custody of the Bureau of Prisons to be

10   imprisoned for a term of one month.

11        Upon release from imprisonment the defendant shall be

12   placed on supervised release for a term of one year.

13        Within 72 hours of release from custody of the Bureau

14   of Prisons, defendant shall report in person to the district

15   to which the defendant is released.

16        Restitution is not applicable.

17        It is further ordered that the defendant shall pay to

18   the United States a fine of $45,000.  This amount shall be

19   paid within 30 days of Judgment being entered unless an

20   alternative payment schedule is requested by the defendant

21   and approved by the Court.

22        While under the Probation Office's supervision, you

23   shall comply with all the terms and conditions that I

24   previously read with regard to Mr. Abbott.

25        I am also imposing a $100 special assessment.

1          Sentence is imposed for all the reasons previously

2    stated and because the Court believes that the sentence and

3    all its components is reasonable and is a sentence that is

4    sufficient, but not greater than necessary, to accomplish

5    the goals of sentencing, consistent with 18 U.S C.

6    Section 3553 and the Supreme Court's guidance.

7          So, with that, I think you said you had some requests

8    about reporting?

9          MR. STEIN:  Yes.  Two request, your Honor.

10          First, with respect to designation, we would request,

11   on behalf of Gregory Abbott, that the Bureau of Prisons

12   designate him to a facility as near as possible to

13   Otisville, New York, that's consistent with his

14   classification.

15          And, secondly, with respect to the timing of surrender,

16   because this is a situation where there's two parents, we

17   would ask that the Court permit the defendants to stagger

18   their surrender dates so that one can be home to care for

19   their children.

20          I believe the Abbotts have discussed this and have

21   decided that their request would be that Mrs. Abbott serve

22   first, that her surrender be earlier, and then Mr. Abbott

23   approximately a month after that.

24          THE COURT:  Okay.

25          MR. DEVLIN-BROWN:  That's correct, your Honor.

```
 1          And with respect to designation, one of Ms. Abbott's
 2   sisters, who lives in California, has agreed to help take
 3   care of Xxxxxx during that period.  So we would like to
 4   request a designation.  I would like, ideally, as near as
 5   possible to Dublin -- her sister's in Los Angeles -- that is
 6   consistent with her security designation.
 7          THE COURT:  And if the court reporter could seal
 8   the name there, please.
 9          And with regard to a reporting date -- the government,
10   obviously, has no concern about self-reporting?
11          MR. ROSEN:  I just want to make sure.  Judge, did
12   you say the community service part of the sentence?  I just
13   didn't hear that.
14          THE COURT:  It was as a condition of supervised
15   release, so, yes.  All the same conditions, including the
16   community service of 250 hours.
17          MR. ROSEN:  Thank you.
18          THE COURT:  With regard to self-reporting?
19          MR. ROSEN:  No objection to the self-reporting or
20   staggering.
21          THE COURT:  And a date for -- the earliest we can
22   do, the Bureau of Prisons can do, it appears to be four
23   weeks.  Typically we'll set it for six weeks out.
24          DEFENDANT MARCIA ABBOTT:  I'm trying to figure out
25   the date.  I'm sorry.
```

1          MR. DEVLIN-BROWN:  Unless your Honor or Probation

2    wants to talk me out of it, we would suggest probably six

3    weeks to give the Bureau of Prisons sufficient time so

4    there's no sort-of-last-minute snafus.

5          PROBATION OFFICER:  Six weeks would be November 19.

6       So my suggestion would be November 19 for Marcia

7    Abbott, and then for Gregory Abbott perhaps at the beginning

8    of January.  So that would be home for the holidays.  But

9    it's up to them if they want to go in at the end of

10   December.

11         MR. STEIN:  We appreciate that, your Honor, and we

12   would agree to that suggestion.

13         THE COURT:  Monday, typically?

14         PROBATION OFFICER:  No.  It can be any -- so,

15   actually, the holiday is probably toward the end of that

16   week.

17      January 1 is a Monday.  I wouldn't suggest January 1.

18   I would suggest the 2nd, 3rd.

19         THE COURT:  Let's do January 3 for Mr. Abbott.

20      I will have you self-report on January 3.

21      For Marcia Abbott, self-report on November 19.

22      And I am realizing I did not mention your right of

23   appeal.

24      Under your terms of your plea agreement, you both have

25   waived your right to challenge your convictions and sentence

1    on direct appeal or in a future proceeding.  You may still

2    appeal on the grounds of ineffective assistance of counsel

3    or that the prosecutor engaged in misconduct.  Any appeal

4    must be filed within 14 days.

5              PROBATION OFFICER:  Your Honor, I just realized I

6    miscalculated the date.

7        Six weeks from today is actually November 20.  I don't

8    know if the extra day makes a difference.

9              MR. DEVLIN-BROWN:  Whatever.  If Mondays tend to be

10   better?  Whatever around that time is convenient.

11             PROBATION OFFICER:  I think either day would work

12   with the Bureau of Prisons, your Honor.

13             THE COURT:  So let's do November 20.

14       I do need to remind you that during the time of your

15   release that you're awaiting execution of the sentence, that

16   if you fail to surrender, that may result in punishment of a

17   fine or imprisonment of not more than ten years, and any

18   such term of imprisonment shall be consecutive to the term

19   of imprisonment here.

20       And if you're convicted of an offense committed while

21   on release, you shall be sentenced, in addition to the

22   sentence prescribed for the offense, to a term of not more

23   than ten years if the offense is a felony, and a term of not

24   more than one year if the offense is a misdemeanor, and

25   again that would be consecutive.

1        Anything else that we need to address today?

2            MR. ROSEN:  No, your Honor.

3            MR. STEIN:  No, your Honor.

4            MR. DEVLIN-BROWN:  No, your Honor.

5            THE COURT:  I wish both of you good luck and

6    success.

7            THE CLERK:  Court is recess.

8        All rise.

9        (Proceedings adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# **C E R T I F I C A T E**

I, James P. Gibbons, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/s/James P. Gibbons          October 11, 2019
     James P. Gibbons

JAMES P. GIBBONS, CSR, RPR, RMR
Official Court Reporter
1 Courthouse Way, Suite 7205
Boston, Massachusetts 02210
jamesgibbonrpr@gmail.com